IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

AT KNOXVILLE

MARCH 1996 SESSION

| | | |
|---|---|---|
| STATE OF TENNESSEE, | ) | |
| | ) | |
| Appellee, | ) | No. 03C01-9509-CC-00269 |
| | ) | |
| | ) | Sevier County |
| v. | ) | |
| | ) | Honorable Ben W. Hooper, II, Judge |
| | ) | |
| ROBERT WAYNE FRANTZ, JR., | ) | (Aggravated kidnapping and rape) |
| | ) | |
| Appellant. | ) | |

For the Appellant:

Charles I. Poole
133 Commerce St.
Sevierville, TN 37862

For the Appellee:

Charles W. Burson
Attorney General of Tennessee
        and
Elizabeth T. Ryan
Assistant Attorney General of Tennessee
450 James Robertson Parkway
Nashville, TN 37243-0493

Alfred C. Schmutzer, Jr.
District Attorney General
        and
Scott Green
Assistant District Attorney General
301 Sevier County Courthouse
Sevierville, TN 37862

OPINION FILED:_____

AFFIRMED

Joseph M. Tipton
Judge

# O P I N I O N


The defendant, Robert Wayne Frantz, Jr., appeals as of right from his conviction by a jury in the Sevier County Criminal Court for the offenses of aggravated kidnapping and two counts of rape, Class B felonies. The trial court sentenced the defendant as a Range II, multiple offender to fifteen years for each offense to be served concurrently. In this appeal, the defendant contends that:

> (1) the trial court erred in restricting the defendant from cross-examining the victim about her divorce proceeding and the judicial determination of fact that the victim had engaged in an adulterous relationship with the defendant until mid-December 1992; and

> (2) the defendant was denied the effective assistance of counsel when defense counsel could not cross-examine a witness about her prior inconsistent statements made to defense counsel.

We affirm the judgment of conviction.


This case relates to events that took place on December 21 and 22, 1992. Although the defendant does not challenge the sufficiency of the convicting evidence, a brief summary of the testimony at trial is useful to the analysis of the issues raised. Cheri Ward, the victim, testified that a consensual sexual relationship began between her and the defendant in August 1992, approximately one month after she and her ex-husband had separated and she had filed for a divorce. She said that she wrote the defendant love letters. She stated that the relationship between her and the defendant continued while the defendant was incarcerated in the county jail in Greenville, South Caroline, on unrelated charges. The victim testified that she visited the defendant at the jail and the defendant called her. She said that after speaking to Deputy Wesley Smith of the Greenville County Sheriff's Department in late November 1992, she decided to end the relationship. She said that she informed the defendant of her decision sometime during the first week of December 1992.

The victim testified that she saw the defendant on December 7, the same day that the defendant was released from jail, when he came to her workplace. She said that she told the defendant not to come to see her at work and that she did not want to see him anymore. The victim stated that the defendant initially refused to leave. She testified that when she left work that night, the defendant was in the parking lot in his car parked next to her car. The victim said that the defendant asked if he could come by her house to get some of his things and she told him to come at a later date. She stated that the next day, the defendant called her at work several times. The victim testified that on December 9, the defendant brought his son to her workplace for her to cut his hair. She stated that although she told the defendant she did not want to talk to him, he repeatedly questioned her whether she was seeing anyone and asked that they work things out.

The victim testified that the defendant was inside her house when she returned from picking up her daughter on December 9. She said that the defendant was very angry because one of her male friends was waiting outside in his car for her to cut his hair. She stated that the defendant eventually left the house, and she called Deputy Smith. The victim testified that when the officers arrived, the defendant was still outside. She said that the defendant was placed on trespassing notice based on his conduct, but the defendant continued to call her. She stated that the defendant also left a message on her answering machine. The victim testified that on December 10, she filed a complaint against the defendant for stalking, and from then until December 21, the defendant called less frequently. The victim denied seeing the defendant romantically after she told the defendant that the relationship was over.

The victim testified that on December 21, she received a telephone call at work from the defendant. She said that the defendant had learned of the stalking charges and was angry. She stated that the defendant told her to drop the charges or

3

he would make her sorry, threatening to help the victim's ex-husband obtain custody of their daughter. The victim testified that she called Deputy Smith and her mother and told them about the defendant's actions and asked her mother to keep her daughter overnight because she was afraid of the defendant.

The victim testified that as she tried to shut the door after arriving at home from work, the defendant stuck his hand in the door and pushed it open, causing her to drop her purse, mail and packages. She said that the defendant grabbed her and placed his hand over her mouth, telling her to be quiet and stating that he only wanted to talk to her. During her testimony, the victim detailed the arguments and the assaults that took place inside the house and explained the attempts she made to get away from the defendant and seek help. She testified that the defendant eventually told her that they were leaving and going to Caesar Mountain so she would listen to him. She said that although she told him that she did not want to go, he forced her to leave the house. The victim testified that she took her cigarettes, purse and beer with her, leaving clothes, cosmetics, and contact solution behind. The victim testified that she screamed and tried to run away from the defendant once they got outside. She said that the defendant became angry, putting his arm around her to force her to go to the truck. The victim stated that the defendant threatened to use a gun once they got inside the truck.

The victim testified that the defendant then drove to Caesar Mountain. She said that the defendant told her that he was hurt and upset. The victim stated that she told the defendant that she was sorry she hurt him and that she would drop the charges if he would take her home. The victim also testified that they discussed Christmas, and she said that she told the defendant that she and her ex-husband had talked about going to Gatlinburg to see the Christmas lights but that she would no longer be able to go. The victim recalled the defendant saying that she would be able

4

to go. She stated that although the defendant told her that he was taking her home, the defendant later stated that they were going for a ride and refused to take her home. During her testimony, the victim described how the defendant watched her when he stopped the truck and how she attempted to call her parents for help on one occasion.

The victim testified that she had fallen asleep but awoke at approximately 4:30 a.m. when the defendant told her that they were in Gatlinburg, Tennessee. She detailed how the defendant walked her into a hotel room and how she attempted to run out the door while the defendant was in the jacuzzi tub, but the defendant grabbed her and pushed her onto the bed. The victim stated that the defendant, who was nude, lay beside her on the bed. The victim said that she fell asleep but was awakened by the defendant rubbing her thighs and back and kissing her neck. She testified that although she told the defendant to stop, he undressed her from the waist down and penetrated her vagina with his finger and his penis. During her testimony, the victim described other attempts to escape from the room and to use the telephone to call for help.

The victim testified that the defendant then took her to a drugstore to purchase saline solution for her contacts and to purchase cosmetics. Before entering the drugstore, the defendant told the victim that if she tried anything, he would use the gun. The victim said that they also went to a restaurant before returning to the room at approximately 12:00 or 12:30 p.m. The victim then described how the defendant raped her a second time.

The victim testified that they then left the motel room and drove up to ski hill, and she said that the defendant threatened to kill them both by driving off the mountain because he said that he could not live without the victim. She said that the defendant then drove to Pigeon Forge where they went to several shops and made

5

purchases. The victim claimed that she paid for her purchases with checks and credit cards to leave evidence of where she had been. She testified that they then went to a restaurant called Jersey Joe's to eat dinner. She said that the defendant allowed her to go to the restroom by herself at the restaurant. The victim stated that she heard a knock and a woman's voice while she was in the restroom. The victim testified that she gave the woman her parent's telephone number and told her to tell them that she had been kidnaped. She said that shortly afterwards, an officer came into the restaurant and arrested the defendant.

The victim testified that in February 1993, approximately one week after her divorce, she received a letter from the defendant. In the letter, the defendant stated that he was sorry about what happened with the victim's divorce and that he did not mean for it to happen. The defendant also expressed his love for the victim and explained that he only wanted the victim to be happy and for them to be a family.

During cross-examination, the victim was questioned about her relationship with the defendant. She testified that she met the defendant approximately two years before she became romantically involved with him. She conceded that her relationship with the defendant developed quickly. She identified several love letters that she wrote to the defendant. The victim also admitted that she went on trips with the defendant along with her daughter and the defendant's son, and she identified several photographs taken while she was dating the defendant. The victim was also cross-examined about the number of collect telephone calls she accepted from the defendant while he was incarcerated in jail. She conceded that she had accepted a total of one hundred and eight telephone calls, talking to the defendant approximately fifty-one hours. The victim admitted that she had stated in her affidavit in support of the stalking warrant obtained on December 10, that she had tried to end the relationship with the defendant approximately three weeks earlier while the defendant was in jail.

6

However, she conceded that between November 19 and December 6, she accepted more than fifteen calls from the defendant, with some calls lasting more than one hour.

The victim also conceded that she gave a false statement in her affidavit in support of the stalking warrant that in the message left by the defendant on her answering machine, the defendant stated that he had talked to the victim's ex-husband and told him a bunch of lies. She denied telling co-workers that if anything happened to her, the defendant was the cause. The victim testified that she did not remember stating at the preliminary hearing that it was not true that she and the defendant were having an affair for months and stating that she and the defendant had dated for two months and that was all. The victim admitted that she never saw the defendant with a gun while she was kidnaped. She also conceded that she had given a statement earlier that the defendant had inserted his finger in her anus, but she claimed that she could no longer remember whether it had happened, stating that therapy had helped her remember some things but not others. The victim admitted that her testimony as to some of the details of the events that took place at the motel were different than to what she testified at the preliminary hearing. She stated that she did not ask for help while at the shops in Pigeon Forge because she was scared. The victim also testified that when she talked to the woman at Jersey Joe's restaurant, she neither told her that she had been raped nor asked her to call the police.

Other witnesses corroborated details of the victim's testimony. Tracy Jones testified that she was eating dinner at Jersey Joe's restaurant on December 22, 1992. She stated that the victim exited the restroom as she was entering. She said that the victim whispered to her in a shaky voice to call her parents because she had been kidnaped by the defendant. She stated that the victim gave her the telephone number of her parents. Ms. Jones testified that the victim continuously looked around and downstairs to see if the defendant was coming. She described the victim as being

7

extremely nervous, shaking and about to cry. Ms. Jones testified that the victim told her several things, some of which she could not remember, but that one thing that stuck in her mind was that the victim told her that the defendant forced her to have sex with him. On cross-examination, Ms. Jones conceded that in her statement to police, she did not state that the victim told her that the defendant had raped her.

## I. CROSS-EXAMINATION ON DIVORCE DECREE

First, the defendant asserts that the trial court erroneously prohibited him from questioning the victim about her divorce proceeding and the judicial determination that the victim had engaged in an adulterous relationship with the defendant until mid-December. The defendant argues that the divorce decree was "relevant, material and admissible." He contends that the divorce decree was admissible as a certified public record under Rule 1005, Tenn. R. Evid., and as a judgment dealing with personal or family history constituting a hearsay exception under Rule 803(23), Tenn. R. Evid. The defendant argues that pursuant to Rule 616, Tenn. R. Evid., and the Sixth Amendment to the United States Constitution, he should have been allowed to question the victim about the divorce proceedings to show that the victim had a motive to lie against the defendant. In response, the state contends that the trial court properly excluded the divorce decree and refused to allow the defendant to question the victim about the divorce proceedings because the findings in the divorce proceedings were irrelevant and inadmissible hearsay.

Before trial, the defendant requested that he be allowed to introduce a divorce decree relating to the victim and her ex-husband, Bryan Ward. The divorce decree reflects that the victim filed for a divorce on July 30, 1992, and Mr. Ward filed a counterclaim. Though the victim withdrew her complaint, Mr. Ward proceeded on his counterclaim, and a divorce was entered on March 9, 1993. The defendant asserted

8

that a portion of the trial court's findings of fact and conclusions of law contained in the divorce decree were relevant and pertinent to his case:

> [Mr. Ward] has shown that [Ms. Ward] over the term of the marriage has engaged in an adulterous relationship without the knowledge or consent of [Mr. Ward]. The actions of [Ms. Ward] have destroyed the marriage. The evidence establishes that [Ms. Ward] had the inclination and the opportunity to commit adultery and did commit adultery with one Robert (Robbie) Frantz, the last occurrence being in mid December 1992. [Mr. Ward] is entitled to an absolute divorce on grounds of adultery.

The defendant argued that he should be allowed to use the divorce decree to cross-examine the victim because he expected the victim to testify that her relationship with the defendant ended when he went to jail on October 24, 1992. The defendant contended that the divorce decree was essential to his defense theory that because the defendant was going to testify at the divorce proceedings in favor of Mr. Ward, the victim voluntarily went to Gatlinburg with the defendant and then filed false charges against the defendant to prevent the defendant from testifying at the divorce proceedings on February 9, 1993. The prosecutor disagreed, stating that the divorce decree was inadmissible in that it was merely a trial court's finding of fact and not an admission by the victim. Without stating the grounds for its exclusion, the trial court ruled that the divorce decree was inadmissible. The trial court stated that although the divorce decree was not admissible, the defendant would be permitted to cross-examine the victim about her relationship with the defendant and whether it extended into mid-December 1992.

At trial, the defendant cross-examined the victim about her relationship with the defendant. The victim's telephone records were introduced during cross-examination to show that the victim accepted collect telephone calls from the defendant while he was in jail. The victim was also questioned about photographs taken of her while dating the victim and about love letters written by her to the defendant.

Pursuant to Rule 616, Tenn. R. Evid., a witness' bias in favor of or against a party or another witness may be proven by cross-examination, extrinsic evidence, or both. As the Advisory Commission Comments to the rule notes, evidence of bias is an important ground for impeachment. See Creeping Bear v. State, 113 Tenn. 322, 325-30, 87 S.W. 653, 653-55 (1905). In Creeping Bear, a murder case, the supreme court held that the defendant was entitled to present witnesses to prove that the state's main witness had a strong friendship with the victim and bitter enmity towards the defendant in order to show that the witness would be predisposed to suppress the victim's aggressive acts and misrepresent the defendant's conduct. The court stated:

> It is always competent to prove the friendliness or unfriendliness of a witness, his partiality for one party or hostility to the other, in order that the jury may judge of his credibility and the trustworthiness of his testimony. It is the experience of the trial courts that witnesses are often as much influenced in testifying by feelings of friendship or hostility to parties to the case as by direct pecuniary interest in the result of the trial, and for this reason proof of the relations of the witness to the parties may be shown by proving his conduct and expressions in relation to them by cross-examination of the witness, or independently by witnesses called for that purpose.

Id. at 325, 87 S.W. at 653. However, when extrinsic evidence is used to demonstrate the witness' bias, the extrinsic evidence must also be admissible under the evidentiary rules. See State v. Williams, 929 S.W.2d 385, 389 (Tenn. Crim. App. 1996).

In the appropriate case, the limitation of the right to cross-examine a witness may violate the defendant's constitutional right to confrontation. See State v. Belser, 945 S.W.2d 776, 783-84 (Tenn. Crim. App. 1996); State v. Reid, 882 S.W.2d 423, 427-29 (Tenn. Crim. App. 1994). The Sixth Amendment provides that the accused shall have the right "to be confronted with the witnesses against him." U.S. Const. amend. VI. The constitutional right of confrontation includes not only the right to confront the witness at trial but also the "'opportunity for effective cross-examination.'" State v. Howell, 868 S.W.2d 238, 252 (Tenn. 1993) (quoting Deleware v. Fensterer, 474 U.S. 15, 20, 106 S. Ct. 292, 294 (1985)).

10

We believe that the trial court did not err by excluding the divorce decree. Though statements contained in the divorce decree could have supported the defendant's claim that the victim was biased against the defendant and that the victim had a motive to lie, the divorce decree constitutes inadmissible hearsay.

Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). Here, the defendant offered the divorce decree to prove the truth of the matter asserted therein -- that the victim had an affair with the defendant until mid-December. Therefore, the divorce decree constitutes hearsay under Rule 801(c), Tenn. R. Evid.

Hearsay is inadmissible unless provided otherwise by an evidentiary rule or by law. Tenn. R. Evid. 802. The defendant contends that Rule 803(23), Tenn. R. Evid., provides an exception to the hearsay rule, allowing the admission of the divorce decree. We disagree. Pursuant to the rule, judgments as to personal or family history or boundaries are not excluded by the hearsay rule if the matters were essential to the judgment. Tenn. R. Evid. 803(23). Judgment as to "personal or family history" relates to matters such as death, marriage, divorce, birth, adoption, legitimacy, and other familial relationships. Neil P. Cohen, et al., Tennessee Law of Evidence § 803(23).1, at 584 (3d ed. 1995). Moreover, we do not believe that the length of the victim's adulterous relationship with the defendant is essential to the divorce decree.

The defendant argues that the divorce decree constitutes a public record admissible under Rule 1005, Tenn. R. Evid. We agree that the divorce decree is a public record. However, Rule 1005 does not provide an exception to the rule excluding hearsay. To the contrary, Rule 1005 provides that the contents of an official record, "if otherwise admissible," may be proved by a certified copy as provided under Rule

11

902(4), Tenn. R. Evid. (emphasis added). As mentioned, the divorce decree is not admissible as it constitutes hearsay for which an exception is not provided.

We also hold that the defendant's constitutional right to confrontation was not violated. The trial court's ruling did not prevent the defendant from questioning the victim about her relationship with the defendant or presenting evidence of the adulterous relationship by other means. In fact, defense counsel conceded at the sentencing hearing that he could have presented the testimony of other witnesses to establish the relevant facts contained in the divorce decree regarding the length of the victim's relationship with the defendant.[1] Despite defense counsel's failure to present witnesses to show that the adulterous relationship between the victim and the defendant continued through mid-December, defense counsel otherwise conducted a vigorous cross-examination of the victim. The defendant was not denied his right to confront witnesses. Accordingly, we conclude that the trial court properly excluded the divorce decree as being inadmissible hearsay and that the defendant's confrontation rights under the Sixth Amendment to the U.S. Constitution were not violated.

## II. INEFFECTIVE ASSISTANCE OF COUNSEL

Next, the defendant contends that he was denied the effective assistance of counsel because defense counsel could not cross-examine Tracy Jones about her prior inconsistent statements made to defense counsel without defense counsel becoming a witness at trial.[2] The state asserts that the defendant has waived the issue by failing to cross-examine Ms. Jones at trial regarding her prior inconsistent statement.

---

[1] The record does not reflect whether defense counsel subpoenaed any witnesses. Defense counsel stated at the sentencing hearing that although he asked Mr. Ward to testify, Mr. Ward told defense counsel that he did not want to get involved. Defense counsel also said that Mr. Ward was present at trial but was excluded as a witness because he sat in the courtroom during the trial. Regardless, the prosecutor stated that Mr. Ward told defense counsel that the dates in the divorce decree were wrong and that the adulterous relationship took place before the defendant was incarcerated.

[2] We note that the defendant's counsel is contending that he, himself, rendered the ineffective assistance of counsel.

12

See T.R.A.P. 36(a). In the alternative, the state argues that the evidence would not have produced a more favorable result for the defendant.

The victim testified that when she saw Tracy Jones at the restroom at Jersey Joe's restaurant, she gave Ms. Jones her parents' telephone number and asked her to call and tell them that she had been kidnaped by the defendant. She said that she did not tell Ms. Jones that she had been raped. When questioned about the victim's statements made to her, Ms. Jones testified that the victim not only told her that she had been kidnaped but also stated that the defendant had raped her. Ms. Jones said that the one thing that stuck in her mind was that the victim told her that the defendant forced her to have sex with him. On cross-examination, Ms. Jones admitted that she did not tell the police that the victim had told her that the defendant had raped her.

In his motion for new trial, the defendant raised as a ground for relief:

> Tracy Jones, a witness for the State materially changed her testimony from statements previously given to . . . counsel during pre-trial preparations and investigation . . . in that she had previously stated that the . . . victim . . . had never even mentioned being raped or sexually assaulted by the defendant but completely changed her testimony at trial to state that what she remembered the most was [the victim's] statement that she had been raped.

The defendant attached to his motion for new trial an affidavit by defense counsel concerning the pretrial discussions defense counsel had with Ms. Jones.

The affidavit states that defense counsel spoke to Ms. Jones on the telephone on January 20, 1994, as part of his investigation and preparation for trial. Defense counsel's affidavit reflects that Ms. Jones told defense counsel that the victim told her that she had been kidnaped and the victim asked her to call her parents. It shows that defense counsel questioned Ms. Jones about her statement to the police, noting that she had not mentioned that the victim had told her that the defendant

13

sexually assaulted or raped the victim. The affidavit states that Ms. Jones told counsel that the victim never stated that she had been sexually assaulted or raped and that the victim only mentioned that she had been kidnaped from South Carolina. The affidavit also reflects that counsel spoke to Ms. Jones in person at the Sevier County Courthouse on February 23, 1995, the day of trial. It states that counsel asked Ms. Jones a second time about her statement to the police, and Ms. Jones again stated that the victim had not told her that she had been raped. Counsel asserted in his affidavit that Ms. Jones' change in testimony from her prior statements was extremely prejudicial to the defendant in that there were no independent witnesses to the conversations between counsel and Ms. Jones, and therefore, counsel was unable to cross-examine Ms. Jones effectively about her prior inconsistent statements without placing counsel in the position of becoming a witness as well as being an advocate.

At the hearing on the motion for new trial, the defendant called Ms. Jones as a witness, but upon objection by the state, the trial court refused to allow Ms. Jones to testify because the accuracy of counsel's affidavit was not being questioned.[3] Defense counsel argued that because he was the only person who interviewed Ms. Jones, he was placed in a situation where he could neither call himself to the stand nor ask Ms. Jones whether she had made a prior inconsistent statement to him. He asserted that he could not be a witness and an advocate for the defendant at the same time. Counsel also stated that he believed that he could only ask Ms. Jones whether it was true that other than her testimony at trial, Ms. Jones had never made the statement that the victim told her that the defendant raped her.

In response, the prosecutor argued that assuming that defense counsel's affidavit was true, it did not provide grounds for relief warranting a new trial. The

---

[3] The record reflects that defense counsel informed the court that Ms. Jones's testimony would be that she remembered the victim's statements regarding the rape after speaking to defense counsel but before testifying at trial.

14

prosecutor asserted that any prior inconsistent statement by Ms. Jones merely provided a basis for impeaching her trial testimony, noting that there was no claim of newly discovered evidence. Defense counsel asserted that a new trial was warranted because he was precluded from further impeaching Ms. Jones with her prior inconsistent statements. The trial court denied the motion for new trial.

Under the Sixth Amendment, when a claim of ineffective assistance of counsel is made, the burden is upon the petitioner to show (1) that counsel's performance was deficient and (2) that the deficiency was prejudicial in terms of rendering a reasonable probability that the result of the trial was unreliable or the proceedings fundamentally unfair. Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984); see Lockhart v. Fretwell, 506 U.S. 364, 113 S. Ct. 838, 842-44 (1993). The Strickland standard has been applied, as well, to the right to counsel under Article I, Section 9 of the Tennessee Constitution. State v. Melson, 772 S.W.2d 417, 419 n.2 (Tenn. 1982).

We question whether the ineffective assistance of counsel issue is properly before us. It is not in the motion for new trial, although the motion does include a complaint about inability to cross-examine Ms. Jones. However, the parties did not direct their attention in the trial court to the issue of the ineffective assistance of counsel. Pursuant to Rule 3(e), T.R.A.P., the failure to state in the motion for new trial the ground upon which a new trial is sought constitutes waiver of the issue on appeal.

Likewise, we note that in State v. Jimmy L. Sluder, No. 1236, Knox County, slip op. at 7 (Tenn. Crim. App. Mar. 1990), app. denied (Tenn. July 16, 1990), this court recognized that when appellate counsel raises on direct appeal the ineffective assistance of counsel issue for the first time, such practice is "fraught with peril." See also State v. Anderson, 835 S.W.2d 600, 607 (Tenn. Crim. App. 1992). The peril is

15

twofold.  First, pursuant to T.R.A.P. 3(e), any issue presented for review which seeks a new trial, such as, ineffective assistance of counsel, must be specifically stated in the motion for new trial or it will be deemed waived.  Thus, absent plain error on the record, see, e.g., State v. Ogle, 666 S.W.2d 58, 60 (Tenn. 1984), such a path by counsel is doomed to procedural failure.  Second, if the appellate court chooses to decide the issue based upon the record before it, appellate counsel has elected to proceed without an evidentiary hearing which, if held, might be the only way that harm could be shown -- a prerequisite for relief in ineffective assistance of defense counsel claims.  Strickland, 466 U.S. at 687, 104 S. Ct. at 2064.  "The better practice is to not raise the issue on direct appeal . . . .  The issue can be subsequently raised in a post-conviction proceeding" if the defendant is not successful on direct appeal.  Jimmy L. Sluder, slip op. at 7.

Thus, we do not believe that the issue of the effective assistance of counsel at trial is properly before us.  In any event, we see nothing worthy of reversal relative to the defendant's underlying complaint relative to Ms. Jones.  The impeachment of her testimony with her prior inconsistent statement would not have affected the outcome of the trial.  At trial, the victim did not testify that she told Ms. Jones at the restroom that the defendant had raped her.  Had the victim testified in this way, Ms. Jones' testimony would only have been considered corroborative of the victim's testimony.  Rather, the victim testified that she did not tell Ms. Jones that she had been raped.  Thus, the only effect impeachment of Ms. Jones' testimony would have been to discredit Ms. Jones' testimony in a way not related to the victim's testimony.  We do not believe that Ms. Jones' testimony on this point was material to the defendant being convicted in this case.  Under these circumstances, we conclude that the failure to impeach her with her prior inconsistent statement did not affect the jury verdict to the defendant's detriment.

16

In consideration of the foregoing and the record as a whole, the judgment of the trial court is affirmed.

                                                                 _____

                                                                 Joseph M. Tipton, Judge

CONCUR:

_____
Paul G. Summers, Judge

_____
Charles Lee, Special Judge