**STATE of Tennessee, Appellee,**

v.

**Eldred REID, Appellant.**

Court of Criminal Appeals of Tennessee, at Nashville.

May 19, 1994.

Permission to Appeal Not Applied for to the Supreme Court.

Karen H. Hornsby, Asst. Public Defender, Murfreesboro, for appellant.

Charles W. Burson, Atty. Gen. of Tennessee and Christina S. Shevalier, Asst. Atty. Gen. of Tennessee, Nashville, Guy R. Dotson, Sr., Dist. Atty. Gen. and William C. Whitesell, Jr., Asst. Dist. Atty. Gen., Murfreesboro, for appellee.

## OPINION

TIPTON, Judge.

The defendant, Eldred Reid, was convicted by a jury in the Rutherford County Circuit Court of the crime of rape, a Class B felony. He was sentenced as a Range I, standard offender to nine years in the custody of the department of correction. He appeals as of right, raising issues which contend (1) that

the evidence was insufficient to convict him of rape, (2) that the trial court's restrictions on his cross-examination of the victim and on his presentation of evidence relative to her bias and motive to fabricate violated his constitutional right to confrontation, and (3) that the trial court improperly enhanced the sentence when no enhancement factors existed. We reverse the conviction because of the trial court's undue restrictions on the defendant's cross-examination of the primary witness against him and on his use of impeaching evidence.

▆ Initially, although the defendant raises an issue about the sufficiency of the evidence, his brief essentially concedes that if the jury believed the state's witnesses, there was sufficient evidence to sustain the rape conviction. His main complaint, though, is that the victim's account of the events should not be accredited. However, questions of witness credibility are for the jury to determine. *State v. Boyd,* 797 S.W.2d 589, 593 (Tenn.1990), *cert. denied,* 498 U.S. 1074, 111 S.Ct. 800, 112 L.Ed.2d 861 (1991). In this respect, an appellate court's standard of review of the evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *see State v. Cabbage,* 571 S.W.2d 832, 836 (Tenn. 1978). Under this standard, we view the evidence to be sufficient to sustain the defendant's conviction.

However, we will recount the essential evidence reflecting the cases for both the state and the defendant. The victim testified that on June 13, 1991, she visited her sister and her husband, Donna and Butch King, at their home in the Lakeside Apartments. As she left to go home and change from work, she saw the defendant coming in. When she returned, the defendant was still visiting the Kings and the two were introduced. He was invited to join them at the V.F.W., a nightspot. She and the Kings went to the V.F.W. and the defendant arrived several hours later at around 9:00 p.m.

The victim testified that her oldest son, Matt, had been seeing Dory Horton's daughter, Michelle, and that they had been having problems with their respective children. She referred to Horton as the defendant's girlfriend and said that she and the defendant talked about the kids. Around 10:00 p.m., the Kings wanted to leave and the defendant offered to take the victim home later. She said that the two of them talked about the kids and that they left around 11:00 p.m. She said she had consumed two and one-half drinks and that the defendant drank beer.

The victim stated that the defendant did not take a normal route to the apartments and that he turned onto a secluded, dead-end road where he stopped. She said that he grabbed her and kissed her and that she started screaming. She stated that he pulled her clothes off and penetrated her. She said that she was scratching him and that when she screamed that she could not breathe, he stopped.

The victim testified that she got dressed and the defendant took her to her sister's apartment. Her younger son came out of the apartment and the two of them went to a Hardee's where her cousin, Kathy Keith, worked. She said that she told Kathy what happened, went home, and then talked to Kathy on the phone. She said she then went to the police station to report the rape and then to the hospital to get examined. She said the police took her home around 4:45 a.m. The state elicited from her that she had nothing to gain or benefit from testifying against the defendant.

Sharon Grigsby, a paramedic who worked part-time at Smyrna Medical Center testified about her assisting the doctor, who died before trial, in an examination of the victim. The victim acknowledged having consensual intercourse two days before the event in question. There was no ripped or stained clothing and the victim was calm, but angry. The victim said that she scratched the defendant's arms, sides and stomach but that the defendant did not injure her. The examination revealed bruises and abrasions on the vaginal wall, but no other injury. Grigsby indicated that such bruising and abrasions could occur with consensual intercourse.

The examination also revealed a bruise on the victim's back and a fingernail indentation on her shoulder.

Mr. and Mrs. King testified and essentially corroborated the victim's testimony regarding the events of that evening. Mr. King said that he had known the defendant for a year and Mrs. King said that she had known him through Dory Horton for years. Kathy Keith testified regarding the complaints her cousin made to her. Detective Laura Williams testified about the victim's complaints and the samples obtained from the defendant. She had pictures taken of scratches on the defendant's body.

Margaret Bash, a serologist for the Tennessee Bureau of Investigation, testified regarding tests performed relative to the case. She said that she found semen and sperm in the victim's sample. Although she indicated that some results were inconclusive, she said that her results did not exclude the defendant. She acknowledged that it was possible to find semen without sperm if a person had received a vasectomy. She stated that she tested fingernail scrapings obtained from the victim, but found nothing.

The defendant testified about the events and his account, in large measure, coincided with the victim's. However, he said he had gone to the Kings to talk about the problem with the victim's son and Dory Horton's daughter. He asserted that the victim became amorous that evening, willingly went parking with him and engaged in consensual sex with him. He stated that he had a vasectomy in 1986. Also, he said he often received scratches in his line of work.

Dory Horton testified that she had known the defendant for six years and admitted having a sexual relationship with him in the spring of 1991 after she had separated from her husband. She stated that she had gone fishing with the defendant several days before the assault was supposed to have happened. She said that the defendant complained about burning under his arm and she saw scratches, although she did not notice if there were scratches on other parts of his body.

The dispositive issue in this appeal relates to what the trial court would not let the defendant attempt to prove. Before trial, the state moved *in limine* to preclude the defense from showing any prior acts or incidents involving the victim, her son, and Dory Horton. The state explained that the day after the event, the victim had gone to Horton's apartment and damaged the door. She pled guilty to vandalism. It indicated that the victim's and Horton's children had dated and that problems arose. It stated that juvenile charges were brought against the victim's son and charges were brought against Donna King, the victim's sister, for harassing phone calls to Horton. The defendant responded that the door incident would rebut the state's implication that the victim was a passive person. Also, he asserted that the circumstances would give the victim a reason to testify falsely in terms of this case being a wedge against Horton in order to get her to dismiss her cases. The trial court granted the motion, stating that it was trying a rape case, "not a juvenile confrontation and these other issues."

At the end of the defendant's cross-examination of the victim, he requested that he be allowed to question her about the precluded matters. He said that the state had proven the relationship of the children and had asked the victim if she had any reason to say or do anything against the defendant. He said that he wanted to explore the fact that, at the time of the claimed rape, Dory Horton had a juvenile warrant against the victim's son and to ask the victim if she ever told anyone she would drop the rape case if Horton would drop the juvenile charge. The trial court refused to allow such questioning.

In a jury-out hearing, the defendant presented Dory Horton and the defendant's wife, Paula Reid, as witnesses in an offer of proof. Horton testified that the defendant visited her frequently and that they had been involved in a sexual relationship in the spring, 1991. She said that Donna King had been her best friend, the two going through nurse training together. She stated that she and the defendant visited with the Kings and that the victim had been present on some of these occasions. She said that the victim's

fifteen-year-old son, Matt, began seeing her nineteen-year-old daughter, Michelle. She said there were problems with them from April through June, 1991, and that she once had to go to the victim's house to get her daughter. She said that Matt had threatened her. Horton stated that by the time of the claimed rape, she had already told the victim and the Kings that she was getting a warrant against Matt.

Horton stated that she was in Atlanta at the time of the incident, but that she returned on June 14. She said that Donna King called her and told her that the defendant raped the victim. She said that Mrs. King stated that if Horton would drop any charges she was going to place on Matt, the victim would drop them on the defendant. She stated that Butch King called her later and put the victim on the phone. Horton testified that the victim said, "Your boyfriend promised me money." Horton said she hung up. She said, then, the victim appeared at her door and told her that the defendant promised her thirty-nine hundred dollars. She said the victim tried to get through the locked storm door and damaged it.

Horton testified that she obtained a warrant against Matt for theft and threats. She said that the warrant against the defendant was issued after she obtained the warrant. She stated that Butch and Donna King later told her that the defendant had promised the victim money and that if Horton would not press charges against Matt, the victim would not press the charge on the defendant.

Paula Reid testified that after her husband was arrested, she received a telephone call from a female who refused to identify herself. The person talked about the assault and asked something about money. She said that a couple of days later, she called a telephone number given to her by the defendant and the person who answered had the same voice as the person who had previously called her. It was stipulated that she would say that the phone number belonged to the victim.

■ The defendant complains that the trial court improperly limited his ability to attack the credibility of the victim. Rule 616, Tenn.R.Evid., provides that a witness' bias

for or prejudice against a party or another witness may be proven by cross-examination, extrinsic evidence, or both. As the Advisory Commission Comment to the rule notes, such evidence is an important ground for impeachment. Indeed, the rule merely embodies principles long established by preceding case law. In *State v. Horne*, 652 S.W.2d 916 (Tenn.Crim.App.1983), this court held that the defense could properly cross-examine a victim about the filing of a civil suit against the defendant because it was relevant to show the victim's bias or interest. It stated:

> Our appellate courts have held consistently that great latitude is allowed in cross-examination, particularly cross-examinations showing the witness' interest or bias. *Union Traction Company v. Todd*, 64 S.W.2d 26, 16 Tenn.App. 200 (1933). In civil cases, it is said that the right to show bias or prejudice should only be limited in extraordinary circumstances. *Phillips v. Pitts*, 602 S.W.2d 246 (Tenn.App.1980).

652 S.W.2d at 918. In *Creeping Bear v. State*, 113 Tenn. 322, 87 S.W. 653 (1905), a murder case, the supreme court held that the defense was entitled to present witnesses to prove that the state's main witness had a strong friendship with the deceased and bitter enmity towards the defendant in order to show that the witness would be predisposed to suppress the deceased's aggressive acts and misrepresent the defendant's conduct. It stated:

> It is always competent to prove the friendliness or unfriendliness of a witness, his partiality for one party or hostility to the other, in order that the jury may judge of his credibility and the trustworthiness of his testimony. It is the experience of trial courts that witnesses are often as much influenced in testifying by feelings of friendship or hostility to parties to the case as by direct pecuniary interest in the result of the trial, and for this reason proof of the relations of the witness to the parties may be shown by proving his conduct and expressions in relation to them by cross-examination of the witness, or independently by witnesses called for that purpose.

87 S.W. at 653.

Further, the issue before us concerns more than just an evidentiary rule. It involves the

core interest secured by the defendant's constitutional right to confront the witnesses against him, i.e., cross-examination.

Cross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested. Subject always to the broad discretion of a trial judge to preclude repetitive and unduly harassing interrogation, the cross-examiner is not only permitted to delve into the witness' story to test the witness' perceptions and memory, but the cross-examiner has traditionally been allowed to impeach, i.e., discredit, the witness. One way of discrediting the witness is to introduce evidence of a prior criminal conviction of that witness.... A more particular attack on the witness' credibility is effected by means of cross-examination directed toward revealing possible biases, prejudices, or ulterior motives of the witness as they may relate directly to issues or personalties in the case at hand. The partiality of a witness is subject to exploration at trial, and is "always relevant as discrediting the witness and affecting the weight of his testimony." 3A J. Wigmore, Evidence § 940, p. 775 (Chadbourn rev. 1970). We have recognized that the exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination. Greene v. McElroy, 360 U.S. 474, 496, 79 S.Ct. 1400, 1413, 3 L.Ed.2d 1377 (1959).

Davis v. Alaska, 415 U.S. 308, 316–17, 94 S.Ct. 1105, 1110, 39 L.Ed.2d 347 (1974) (footnote omitted).

The defendant asserts that if Horton's and the defendant's wife's testimony had been submitted to the jury and believed by it, then it could have inferred that the victim and the Kings were motivated to testify as they did by interests other than the truth. He also asserts that the same would be true if the defendant had been permitted to elicit an acknowledgement of such facts by the victim during cross-examination.

■ In response, the state indicates that the defendant's proffered evidence is incredible, referring in its brief to the proof corroborating the victim's testimony and stating that "[t]he idea that this was all a plot by the victim to get back at a *friend* of the defendant, not the defendant himself, a man she had never met before, is quite unbelievable." The flaw in this argument is that the credibility of the witnesses was for the jury to decide—not us—as an adjunct to the defendant's right to trial by jury. That is, if the evidence is relevant and otherwise conforms to the evidentiary rules, its admissibility before the jury is not contingent upon a judicial determination that it is entitled to be accredited.

■ Also, the state places significance upon the fact that the evidence showed prejudice against Dory Horton, not the defendant. However, the object of a witness' prejudicial interest need not be a party and the relevant inquiry remains whether or not the witness' interest is connected with his or her testimony in such a manner as to motivate the witness to be less than truthful in that testimony.

In *Olden v. Kentucky*, 488 U.S. 227, 109 S.Ct. 480, 102 L.Ed.2d 513 (1988), a rape case, the defendant claimed that consensual sex was involved. He sought to prove that, at the time of the trial, the victim was living with a man with whom she had had an extramarital relationship at the time of the incident. The purpose was to show that the victim was motivated to testify falsely by denying consent in order to protect her relationship with her lover. The trial court excluded the evidence because it was prejudicial to the victim. The Supreme Court reversed under the Confrontation Clause because the trial court excluded evidence from which a reasonable inference could arise that the victim was motivated to lie. Obviously, the victim's interest in *Olden* was in her lover and her relationship with him, not the defendant, but the Supreme Court recognized that the interest could motivate her to lie against the defendant. In the present case, it may be that the victim's interests or prejudice were directly concerned with her son and Horton, but with evidence of her perceived connection between Horton and the defendant, it does not take an irrational inference to establish how her interests could

motivate her to testify falsely in the defendant's case.

■ Likewise, the state makes much of the fact that a lot of the events shown by the offer of proof took place after the rape was supposed to have occurred. We note, though, that Horton testified that she told the victim and the Kings before the incident that she was going to get the warrant. Also, the state's position ignores the fact that the issue of the credibility of witnesses involves bias or interests existing at the time that they testify, not just such motivations which predate the claimed offense. In this respect, we note that in *Olden,* the main fact sought to be proved by the defendant was that the victim and her lover were living together at the time of the trial, an arrangement which did not exist at the time of the alleged incident.

The state also contends that it is significant that the Kings, not the victim, offered to trade the dropping of the charges and that the victim did not tell Horton the purpose for her money demand. Apparently, the state is unwilling to allow the defendant the benefit of reasonable inferences from the evidence presented. The proven relationships of the Kings to the victim and of Horton to the defendant, the timing and substance of the relevant conversations and the victim's appearance at Horton's home after their telephone conversation which was initiated by Butch King would permit a reasonable inference that the victim and the Kings were acting in concert to influence Horton by the allegations against the defendant.

In any event, if the defendant had been granted his request to cross-examine the victim about the juvenile charges against her son and about telling anyone she would drop the rape case if the juvenile charges were dropped, the direct proof which the state implies is lacking might have been presented. In this respect, the offer of proof presented sufficient evidence of the defendant having a good faith basis to cross-examine the victim about these matters. Under the circumstances of this case, we conclude that under Rule 616, Tenn.R.Evid., and the constitutional right to confrontation, it was error for the trial court to prohibit the defendant from cross-examining the victim as he requested and from proving by extrinsic evidence the demands made upon Dory Horton.

■ The state contends, finally, that the trial court's prohibitions, if error, were harmless. In *Delaware v. Van Arsdall,* 475 U.S. 673, 681, 106 S.Ct. 1431, 1436, 89 L.Ed.2d 674 (1986), the Supreme Court stated that a violation of the right to confrontation may be deemed harmless "if the reviewing court may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt." *See Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). It noted that as opposed to cases involving evidence which was improperly presented to the jury, these types of cases often deal with the effect of wrongfully excluding evidence. It provided the following standard:

> The correct inquiry is whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt. Whether such an error is harmless in a particular case depends upon a host of factors, all readily accessible to reviewing courts. These factors include the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case.

475 U.S. at 684, 106 S.Ct. at 1438. This standard means that we must assume that the jury would have determined that the victim was aware before the incident of Horton's intent to charge her son, had demanded money from the defendant, and had offered not to press or to drop the charge against the defendant if Horton dropped or did not press the charge against her son.

The state contends that its evidence was conclusively strong, relying upon the witnesses who corroborated the victim's testimony. Obviously, the only witnesses to the incident, itself, were the victim and the defendant,

whose accounts were in conflict. Most of the physical and medical evidence was generally inconclusive relative to whether there was force or consent. There were scratches on the defendant's body which corroborated the victim's account, but the defense presented an explanation for them, as well.

Needless to say, the victim was a crucial witness to the state's case and an attack upon her credibility which would lead a jury to doubt her truthfulness would be significant. Granted, there was unimpeached evidence, entered without objection, of the victim telling others, such as, her cousin and Detective Williams, of the rape shortly after the incident which support the victim's credibility. However, in assuming that the damaging potential of the excluded cross-examination and evidence had been realized, we believe that there would be sufficient evidence from which the jury could infer that the victim's complaints about the incident were motivated by interests other than the truth.

■■■ In consideration of the evidence presented and wrongfully prohibited from being presented, we cannot confidently hold that the violation of the defendant's right to confrontation was harmless beyond a reasonable doubt. We recognize that the trial court is authorized to exercise its discretion in imposing appropriate limits upon the examination of witnesses. *See* Tenn.R.Evid. 611; *State v. Lewis,* 803 S.W.2d 260, 262 (Tenn. Crim.App.1990). Also, a defendant's right to confrontation does not preclude a trial court from imposing limits upon cross-examination which take into account such factors as harassment, prejudice, issue confusion, witness safety, or merely repetitive or marginally relevant interrogation. *See Olden v. Kentucky,* 488 U.S. at 232, 109 S.Ct. at 483; *Delaware v. Van Arsdall,* 475 U.S. at 679, 106 S.Ct. at 1435. However, the trial court's prohibition went beyond reasonable limits given the importance of the victim as a witness and the relevance of the defendant's proffered cross-examination and evidence to the victim's bias and interests.

■■■ The defendant complains about the trial court enhancing his sentence above the minimum by finding that "psychological injury" was inflicted upon the victim and that confinement was necessary to avoid depreciating the seriousness of the offense. He asserts that such determinations are not enhancement factors under T.C.A. § 40–35–114. We agree that such findings, by themselves, do not establish any of the enhancement factors contained in T.C.A. § 40–35–114 which would allow for enhancement of a sentence above the presumptive minimum. *See State v. Dykes,* 803 S.W.2d 250, 258 (Tenn. Crim.App.1990). The state concedes that the trial court did not follow proper procedure in sentencing the defendant, but it asserts that the case should be remanded only for the trial court to set out the mitigating and enhancement factors it found to apply and not for a new sentencing hearing. If the remand were based solely upon the sentencing errors, we believe it would be preferable to allow the trial court to determine whether or not grounds exist for further proof relevant to sentencing. However, in reversing the conviction, we have rendered this issue moot.

In consideration of the foregoing and the record as a whole, the judgment of conviction is reversed. The case is remanded to the trial court for a new trial.

WHITE, J., and CORNELIUS, Special Judge, concur.