IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
October 2, 2019 Session

## STATE OF TENNESSEE v. NATHAN ALLEN WALLACE

**Direct Appeal from the Circuit Court for Tipton County**
No. 9244        Joseph H. Walker, III, Judge

### No. W2018-01649-CCA-R3-CD

A Tipton County jury convicted the Defendant, Nathan Allen Wallace, of rape, aggravated statutory rape, contributing to the delinquency of a minor, and incest, and the trial court sentenced him to eight years in the Tennessee Department of Correction. On appeal, the Defendant asserts that the trial court erred when it: (1) admitted prior statements by the victim into evidence; (2) declined to enforce a subpoena for the victim's DCS record; (3) admitted expert testimony on the subject of "grooming"; and (4) limited his cross-examination of the victim. The Defendant also contends that the evidence is insufficient to support his convictions and that his request for a suspended sentence should have been granted. After a thorough review of the record and the applicable law, we affirm the trial court's judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which THOMAS T. WOODALL and NORMA MCGEE OGLE, JJ., joined.

Blake D. Ballin and Richard S. Townley, Memphis, Tennessee, for the appellant, Nathan Allen Wallace.

Herbert H. Slatery III, Attorney General and Reporter; Jonathan H. Wardle, Assistant Attorney General; Mark E. Davidson, District Attorney General; and James Walter Freeland, Jr., Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION
#### I. Facts

This case arises from the Defendant's rape of the victim, his fifteen-year-old daughter, while she was intoxicated. Based on this conduct, a Tipton County grand jury indicted the Defendant for rape, aggravated statutory rape, contributing to the delinquency

of a minor, and incest. The Defendant entered a best interest plea to the incest and aggravated statutory rape charges, and the State agreed to dismiss the remaining charges; the Defendant subsequently filed a motion to withdraw his plea, alleging that it was based on incorrect information he had received regarding the sex offender registry. The trial court granted his motion to withdraw the plea. Prior to trial, the Defendant subpoenaed the victim's sealed records kept by the Department of Children's Services ("DCS"), requesting an *in camera* review of the records on the basis that they contained exculpatory information or information about the victim's accusations against other individuals. The trial court conducted an *in camera* review of the sealed DCS record and concluded that they did not contain exculpatory material or information about the victim accusing anyone other than the Defendant of sexual abuse. The trial court ordered that the records remain under seal and thus declined to enforce the subpoena.

## A. Trial

The following evidence was presented at the Defendant's trial: Zachary Tucker testified that he had known the Defendant since 2010 and that he also knew the victim, the Defendant's daughter. Mr. Tucker estimated the victim was fourteen years old. Mr. Tucker was often at parties at the Defendant's house during the summer of 2016, and the victim was occasionally there as well. Mr. Tucker stated that the victim drank alcohol at these parties.

Chris Ellwood testified that he was an investigator with the Atoka Police Department, located in Tipton County, where the Defendant's residence was also located. Investigator Ellwood first became aware of the allegations against the Defendant in January 2017; he was contacted by the victim's mother, Crystal Draffin. As a result of Ms. Draffin's contact, Investigator Ellwood contacted DCS, and then he met with DCS Investigator Teresa Cook and Ms. Draffin at Ms. Draffin's home. The victim was also present at the meeting. Following the meeting, a forensic interview was scheduled, and the victim gave a formal statement at the February 1, 2017 interview.

Following the interview, the Defendant was given notice from DCS to cease contact with the victim. In response to that notice, the Defendant came to the Atoka Police Department to make contact with Investigator Ellwood. The Defendant spoke to Investigator Ellwood regarding his family history with Ms. Draffin and their custody issues related to the victim. Because Investigator Ellwood was aware that the victim had accused the Defendant of rape, he advised the Defendant of his *Miranda* rights. The Defendant indicated that the DCS issues were related to Ms. Draffin using marijuana with the victim.

Investigator Ellwood agreed that he had met with the victim and/or Ms. Draffin

numerous times, and he had also been present at several interviews where the victim gave a statement. Defense counsel objected to Investigator Ellwood's testimony with regard to what was said in the victim's multiple statements. Investigator Ellwood, without testifying to what the victim said, testified that there were not any inconsistences in the victim's multiple accounts given about the rape.

On cross-examination, Investigator Ellwood stated that the Defendant told him that the victim had been present at the parties described by Mr. Tucker. The Defendant told Investigator Ellwood that he had to fight with the victim about dressing appropriately for school and regularly attending school. He stated that the victim saw a therapist and had two boyfriends.

Crystal Draffin testified that she entered into a relationship with the Defendant in 1998 when she was fifteen years old and the Defendant was seventeen years old. The two never married but had a child together, the victim, in 2001. The couple separated in 2005 because they had "grown apart." Ms. Draffin and the Defendant, with the aid of an attorney, divided their custody of the victim in a parenting plan; generally, the victim stayed with Ms. Draffin during the week and with the Defendant on the weekends. Between 2005 and 2016, Ms. Draffin and the Defendant were in several relationships with other people, and the Defendant was married for a few years. Ms. Draffin also remarried and divorced, and then got remarried again to her present husband, Mike Draffin, in 2011.

Ms. Draffin stated that her third husband, Mr. Draffin, was a good father and that her children, including the victim, loved him. Mr. and Ms. Draffin's blended family consisted of six children of which the victim was the eldest. Describing the victim's behavior from 2017 until the time of trial, Ms. Draffin testified that the victim was doing well in school and had graduated from high school with honors and had also obtained her driver's license. Ms. Draffin testified that victim had always been shy and quiet since her early childhood and recalled that she saw a change in the victim in 2015 and/or 2016. The victim first began listening to music about drugs and prostitution. Then she attempted to "hurt" herself by ingesting a "handful" of Advil while at the Defendant's house.

In July 2016, the victim, the Defendant, Ms. Draffin, Mr. Draffin, and a DCS worker met at the DCS office to discuss that the victim had tried to harm herself. During the meeting, the victim stated that she wanted to stay at the Defendant's house with him. The victim also told the DCS worker that she had obtained the pills from Ms. Draffin's house, in order to protect the Defendant from getting in trouble. The victim was admitted to a treatment center for one week and then went to the Defendant's home "permanently" after her release from the treatment center on July 17, 2016. Ms. Draffin

3

stated that she felt that the victim could make her own decisions about where to live, and Ms. Draffin wanted her to be comfortable.

On January 23, 2017, Ms. Draffin learned of the Defendant's crimes that had occurred sometime after July 17, 2016, when the victim went to live with the Defendant. Ms. Draffin learned of his crimes through pictures and videos of the victim found on the victim's cell phone. Ms. Draffin recalled that on January 23, 2017, the victim told her of the Defendant's crimes. Ms. Draffin immediately contacted law enforcement.

Dr. Lisa Piercy testified as an expert in the field of pediatrics and child abuse, which encompassed child sexual abuse, based on her medical specialty in the area of diagnosing child maltreatment. Prior to Dr. Piercy taking the witness stand and outside the presence of the jury, defense counsel objected to her proposed testimony on the "idea of grooming," arguing that it was a "psychological idea" not contained in her physical examination report. Because it was not contained in the report, defense counsel argued that he had not procured an expert to testify on the Defendant's behalf with regard to the subject. He additionally argued that the grooming concept tended to show that the victim fit a certain profile of a sexually abused child based on the Defendant's efforts to groom her, and therefore tended to show the victim was more likely telling the truth. This, he argued, amounted to "bolstering" of the victim's testimony before she actually testified. The State argued that the absence of information about child grooming in the expert's report was not a basis for exclusion. The State further responded that Dr. Piercy would not be giving an opinion as to the victim's truthfulness but only the consistency of her medical findings with the victim's statements to her. The trial court stated that it would allow testimony about child grooming but stated it would reserve judgment as the evidence developed. The trial court commented that this testimony seemed to be "common sense" and not that of which an expert opinion was required.

Dr. Piercy testified that she evaluated and examined the victim in this case on February 14, 2017. Dr. Piercy generated a report based on their meeting. The victim told Dr. Piercy that the Defendant had, in the summer of 2016, gotten her drunk and done "some stuff" to her. The victim listed at least five brands of alcohol given to her by the Defendant, and she stated that the Defendant had "rolled a joint" for the victim to smoke. The victim told Dr. Piercy that, on one occasion when the Defendant was hosting a party at his house, she got drunk and could not walk so the Defendant put her in bed. The victim fell asleep and woke to the Defendant undressing her. The Defendant took off the victim's underwear and then vaginally penetrated her with his fingers before inserting his penis into her vagina. The victim cried for the Defendant to stop, but he pushed inside her harder. This occurred for a few minutes until the Defendant ceased, and the victim went to sleep.

4

Dr. Piercy performed a physical examination of the victim and stated that the condition of the victim's vagina and hymen were consistent with penile vaginal penetration. Dr. Piercy stated that it was common for a child victim not to report the sexual abuse right away, as was the case with the victim herein. This was particularly true when the perpetrator was an authority figure or close friend or relative. Dr. Piercy stated that alcohol was often used by a perpetrator to manipulate a victim to gain favor or access to the victim. She described this process as "grooming." The Defendant renewed his objection to this testimony, and the trial court overruled the objection.

The victim testified that she was fifteen years old in 2016 and that the Defendant was her father. In 2016, the victim was going back and forth between her mother's and the Defendant's house at her choosing. The Defendant lived alone. The victim described herself as a "daddy's girl" until the Defendant's assault occurred. In 2016, when the victim would stay with the Defendant, he would give her alcohol, specifically "Fireball," and allow her to smoke cigarettes and marijuana. He also provided psychedelic mushrooms. Other adults attended parties at the Defendant's house, including Mr. Tucker. The victim had her own bedroom there. During his parties, the victim was allowed to drink beer through a funnel and play "beer pong."

The victim recalled that she took a large amount of pills and was treated at a treatment facility in July 2016 as a result. Upon her release, the victim went to live with the Defendant. The victim testified that she wanted to wear jeans and t-shirts, but the Defendant wanted her to wear clothes that made her look more like a woman. Even though she "hated it," the victim changed into tighter fitting clothing when she stayed at the Defendant's house. In July 2016, the Defendant held another party at his residence, and the victim got drunk after drinking vodka and beer. The victim became too intoxicated to stand up and fell over. She described feeling "very drunk" and not being able to see straight. The Defendant carried the victim to her bed where she fell asleep; when she awoke the Defendant was removing her clothing. The Defendant removed her pants and underwear and put his fingers inside her vagina and rubbed it. The victim was scared and struggled to get away from him while the Defendant told her to "stop." The Defendant was breathing heavily. The Defendant put his mouth on the victim's breast. The victim described the Defendant putting his penis inside of her vagina, stating that it hurt badly and was "against [her] will." She felt a tearing sensation in her vaginal area. The victim testified that she resisted throughout the encounter and was crying.

The victim testified that her mattress had blood on it and so a day or two later, the victim and the Defendant took the mattress to the shed outside his house. The victim remained upset and told the Defendant that she wanted it to be special when she had intercourse for the first time; the Defendant replied that he was sorry and did not remember what had happened. He also told the victim that if she said anything about

5

the rape, he would be "taken away" for a long time.  The victim posted a picture of herself on the internet soon after that said, "Please f***ing kill me."  The victim testified that she was sad because the Defendant hurt her.  A couple days after the rape, the Defendant gave the victim a bunny rabbit, a gift she had been wanting for a long time. The victim still felt the pain of the rape, but the bunny made her happy and the Defendant told the victim he wanted her to feel better.

On cross-examination, the victim admitted that she had made several statements about the rape and that her recall with regards to time periods or dates was not good. The victim agreed that she smoked cigarettes without her parents' knowledge.  She agreed that she did not tell anyone about the rape in July 2016 and that she stayed with the Defendant after the rape but before she made the disclosure to her mother.

The victim was asked about a series of text messages between herself and the Defendant sent after July 2016 but before the rape accusation in January 2017.  The victim testified about the contents of the messages until the State objected to the messages containing the Defendant's statements to the victim on the grounds that they were hearsay.  Defense counsel replied that they were not being offered for the truth of the matter asserted but to provide context for the victim's and the Defendant's relationship.  The trial court allowed the line of questioning to continue until the State objected again on the grounds that the Defendant's statements made after the July 2016 rape were made for future use at trial and, as self-serving, uncross-examined hearsay, were not admissible.  The trial court sustained the objection.  The Defendant's further questions of the victim about the Defendant's statements to her were objected to by the State, and trial court sustained the objections.  At this point, the trial court advised defense counsel that he was repeatedly covering the same ground and should cease questioning about the Defendant's statements in the text messages.  The victim agreed that she exaggerated stories about staying with her mom or the Defendant with regards to rules, bedtimes and drug and alcohol use.  The victim recalled many discussions with the Defendant about her bedtime and telephone use during the night.

Based upon the evidence presented at trial to the jury, the Defendant was convicted of rape, aggravated statutory rape, contributing to the delinquency of a minor, and incest. The trial court found that the Defendant was a standard offender with a minor criminal record of traffic offenses.  For the rape conviction, the trial court imposed a sentence of eight years; for the aggravated statutory rape conviction, a concurrent sentence of two years; for the contributing to the delinquency of a minor conviction, a concurrent sentence of eleven months and twenty-nine days; and for the incest conviction, a concurrent sentence of three years, for a total effective sentence of eight years.  The sentence was to be served at 100% as required by statute, Tennessee Code Annotated section 40-35-501. As to the issue of probation, the trial court concluded in a written order that the

6

circumstances of the offense, the Defendant being the victim's father and his behavior towards her, determined that an alternative sentence was not warranted. The trial court made this conclusion in light of its consideration of the deterrent effect on the Defendant and the best interests of the public and the victim. The trial court further concluded that probation would not serve the ends of justice or society as a whole. It is from these judgments that the Defendant now appeals.

## II. Analysis

On appeal, the Defendant asserts that the trial court erred when it: (1) admitted prior statements by the victim into evidence; (2) declined to enforce a subpoena for the victim's DCS record; (3) admitted expert testimony on the subject of "grooming"; and (4) limited his cross-examination of the victim. The Defendant also contends that the evidence is insufficient to support his convictions and that his request for a suspended sentence should have been granted.

### A. Evidentiary Issues

As stated above, the Defendant raises several issues with regards to the admission of evidence. Under Rule 401, "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Rule 402 states, "All relevant evidence is admissible except as provided by the Constitution of the United States, the Constitution of Tennessee, these rules, or other rules or laws of general application in the courts of Tennessee. Evidence which is not relevant is not admissible." Tenn. R. Evid. 402. Finally, Rule 403 states, "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403. "The decision regarding the admissibility of [evidence] pursuant to these Rules lies within the sound discretion of the trial court and will not be overturned on appeal absent a clear showing of an abuse of that discretion." *State v. Young*, 196 S.W.3d 85, 105 (Tenn. 2006) (citing *State v. Banks*, 564 S.W.2d 947, 949 (Tenn. 1978)).

### 1. Victim's Prior Statements

The Defendant asserts that the trial court erred when it admitted into evidence Investigator Ellwood's testimony about the consistency of the victim's prior statements because it amounted to bolstering the victim's credibility. He additionally asserts that Dr. Piercy's testimony about the victim's statements to her was inadmissible hearsay and

should have been accompanied by a limiting instruction that the victim's statements were not to be relied on as substantive evidence. The State responds that Investigator Ellwood did not testify to the substance of the victim's prior statements but only that he searched for inconsistencies in the statements throughout his investigation as part of standard protocol. This, the State argued in response to the Defendant's objection, was part of the State's effort to show the thoroughness of the investigation into the victim's accusations. The State argues that this was not "impermissible bolstering." The State further responds that Dr. Piercy's testimony was admissible pursuant to the medical records exception to the hearsay exclusion rule.

During Investigator Ellwood's testimony about the victim's multiple statements, defense counsel objected to any testimony about the contents of the victim's statements. Defense counsel made no reference to the "bolstering" argument he raises on appeal. Without a specific objection to this aspect of the testimony, the trial court did not make a ruling on the argument and thus, it is not properly preserved for review on appeal. *See* Tenn. R. Evid. 103 (requiring an objection to the admission of evidence "stating the specific ground of objection if the specific ground was not apparent from the context"). Accordingly, the issue is waived.

We turn to the Defendant's argument that Dr. Piercy's testimony about the victim's statements to Dr. Piercy during her forensic medical examination was inadmissible hearsay and also impermissible bolstering of the victim's credibility. We initially point out that this testimony was merely corroborative of the victim's testimony, and thus no limiting instructive was required. *See State v. Jordan*, 325 S.W.3d 1, 53 (Tenn. 2010) (requiring a limiting instruction when an expert testifies to otherwise inadmissible hearsay; in *Jordan*, the hearsay was an out-of-court statement of a sheriff's deputy who did not testify at trial.) Furthermore, we agree with the State that Dr. Piercy's testimony was admissible pursuant to Tennessee Rule of Evidence 803(4) which allows for the admission of hearsay statements made for the purpose of medical diagnosis or treatment. Dr. Piercy testified that she was examining the victim for the purpose of making a medical diagnosis, child sexual abuse. Accordingly, the trial court did not abuse its discretion when it admitted this testimony. The Defendant is not entitled to relief as to this issue.

## 2. Sealed DCS Records

The Defendant next contends that the trial court erred when it declined to enforce the subpoena of the victim's sealed DCS records. He contends that the trial court's *in camera* review of the records did not encompass the victim's entire DCS file, and that, because the Defendant has no knowledge of the records' contents, he was denied his due process rights. The State replies that the Defendant has waived this issue because he did

not ask the trial court to "compel compliance" of the subpoena.

The record indicates that, before trial, defense counsel requested a review of the victim's sealed DCS records to determine whether the records contained exculpatory material. Apparently, the trial court conducted an *in camera* review of the records and determined that they did not contain exculpatory material and thus should remain sealed. In an order, the trial court stated that the records contained interviews with the victim and her family, along with other DCS records, and that the records contained nothing exculpatory and did not contain any other accusations than that which the victim had reported regarding the Defendant.

A defendant has a right to disclosure of exculpatory evidence that is material to guilt or punishment. *Brady v. Maryland*, 373 U.S. 83, 87 (1963). The right to receive *Brady* material is the constitutional component of a defendant's right to pretrial discovery. *See also* Tenn. R. Crim. P. 16 (defining the State's statutory duty to disclose evidence to the defense). The Confrontation Clause affords a defendant the rights to confront and cross-examine the witnesses at the trial. U.S. Const. Amends. VI, XIV; Tenn. Const. art. 1, § 9; *see, e.g., State v. Williams*, 913 S.W.2d 462, 465 (Tenn. 1996); *State v. Middlebrooks*, 840 S.W.2d 317, 332 (Tenn. 1992), *superseded by statute on other grounds as stated in State v. Reid*, 91 S.W.3d 247, 306 (Tenn. 2002). A DCS file may be submitted to a trial court for *in camera* review, and if a defendant is aware of specific information in the file, he may request it from the court and argue its materiality." *Charles Ritter v. State*, No. E2008-01278-CCAR-3-PC, 2009 WL 3711991 at *8 (Tenn. Crim. App. at Knoxville, Nov. 6, 2009) (citing *Pennsylvania v. Ritchie*, 480 U.S. 39, 60 (1987)), *no perm. app. filed*.

In this case, the trial court reviewed the victim's DCS file as the Defendant had requested and determined that it did not contain *Brady* material. We have also reviewed the records, and they appear to be the entirety of the victim's records. We agree that the records do not contain any exculpatory evidence or any evidence beyond that which was presented at trial. Accordingly, we conclude that the trial court did not abuse its discretion when it declined to unseal the victim's records and when it declined counsel's request to review the records. The Defendant is not entitled to relief as to this issue.

### 3. Dr. Piercy's "Grooming" Testimony

The Defendant next contends that the trial court erred when it allowed Dr. Piercy to testify about the Defendant "grooming" the victim for sexual abuse when this concept was not included in Dr. Piercy's medical report. He argues that "grooming" "lacks a sufficient scientific basis" and prejudices the Defendant because it was not disclosed to him prior to trial. The State replies that the rules of discovery do not require disclosure before trial of the bases for an expert's testimony or a report containing everything the

expert might testify about. The State further responds that "grooming" is an accepted concept in child sexual abuse cases that has been testified about by law enforcement and forensic and medical experts in multiple cases.

Rule 404(b) of the Tennessee Rules of Evidence states that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait. It may, however, be admissible for other purposes." The court may admit the evidence for non-character purposes if four conditions are met:

(1) The court upon request must hold a hearing outside the jury's presence;

(2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;

(3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and

(4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b). If a trial court "substantially complies" with these requirements, this court will review for an abuse of discretion. *State v. McCary*, 119 S.W.2d 226, 244 (Tenn. Crim. App. 2003) (citing *State v. DuBose*, 953 S.W.2d 649, 652 (Tenn. 1997)).

As the State points out, this court had deemed admissible evidence of a defendant's "'grooming' of a victim," including "bad acts committed during or in preparation for the charged offense." *See State v. Daniel Pottebaum*, No. M2007-02108-CCA-R3-CD, 2008 WL 5397848, at *9 (Tenn. Crim. App., at Nashville, Dec. 30, 2008), *Tenn. R. App. P. 11 application denied* (Tenn. June 1, 2009) (citing *State v. Wesley Earl Brown*, No. M2003-02801-CCA-R3-CD, 2005 WL 1412088, at *10 (Tenn. Crim. App., at Nashville, Jun. 16, 2005), *Tenn. R. App. P. 11 application denied* (Tenn. Dec. 5, 2005)). Acts of "grooming" include showing pornographic videos to a child victim and, as in the present case, providing marijuana to the child victim before the molestation. *Id.* (citations omitted).

The Defendant objected to the testimony on the grounds that it was not contained in Dr. Piercy's report and on the grounds that it was without a scientific basis. The trial court considered the evidence sought to be admitted, outside the presence of the jury, and overruled the objection on the basis that giving a child victim drugs or alcohol to gain

10

access to the child seemed to be a "common sense" concept. The trial court substantially complied with Rule 404(b). Our review of the applicable law indicates that the concept of "grooming" is one that has been recognized by the courts of this state as well as other jurisdictions and is properly admitted through evidence of a defendant's bad acts to gain favor or gain access to a victim. *See Pottebaum* (citing *Brown*, 2005 WL 1412088, at *10, *Frazier v. State*, 557 S.E.2d 12, 18 (Ga. Ct. App. 2001); *State v. Blackstead*, 878 P.2d 188, 192 (Idaho Ct. App. 1994); *State v. Anderson*, 657 N.W.2d 245, 247-49 (N.D. 2003)). Accordingly, we conclude that trial court did not abuse its discretion when it admitted Dr. Piercy's testimony on this subject. The Defendant is not entitled to relief as to this issue.

### 4. Limitation on Cross-Examination of the Victim

The Defendant contends that the trial court improperly limited his cross-examination of the victim about text messages the victim exchanged with the Defendant. He claims that the limitation "improperly restricted [his] right to cross-examine the child victim." The State replies that the trial court allowed the Defendant to cross-examine the victim at length about the text messages and only limited the questioning when the victim stated she could not remember the exchange or when defense counsel sought to read aloud the Defendant's messages, which the State claims were self-serving hearsay.

At trial, the Defendant sought to introduce text message exchanges through cross-examination of the victim that "tended to show both that [the victim] had an on-and-off relationship with her father for the six months after the alleged assault, sometimes quite normal and other times fighting about the rules, and that [the victim] often attempted to manipulate one parent or the other." Initially, the trial court allowed the Defendant to cross-examine the victim at length about her text messages with the Defendant and messages left on her public social media account. After a period of questioning, the State objected that the Defendant's messages were hearsay, not subject to cross-examination, and were "self-serving speech." The Defendant argued that the messages were not hearsay, but conceded that a limiting instruction to the jury would be appropriate, instructing the jury that the messages were being introduced only to show context of the victim's and the Defendant's relationship after the victim said she had been raped by him. The trial court gave a limiting instruction to the jury stating that the messages were only admissible as evidence of their effect on the victim and the Defendant.

Following the limiting instruction, the Defendant continued to question the victim about her message exchanges with the Defendant. At a certain point during this second period of questioning, the victim stated that she did not remember the text message

exchange that she was being asked about. At this point, the trial court sustained the State's objection to the admissibility of the text message exchange based upon the victim's inability to identify the exchange. A third period of questioning ensued, and when the victim stated she did not remember certain messages, the State objected again, arguing that the messages posted to a public social media account months after the rape were self-serving hearsay and being posted for future use at trial to benefit the Defendant. The trial court sustained the objection.

Nonetheless, the Defendant continued to question the victim about the text message exchanges several more times. The State continued to object and a bench conference was held. The trial court told the Defendant that he was attempting to introduce the same type of evidence repeatedly; the Defendant responded that the messages were not hearsay but being offered to show that the Defendant was enforcing rules on the victim that she did not want to follow. The trial court sustained the State's objection. The Defendant went on to cross-examine the victim at length about the remainder of the messages, omitting the objectionable portions. The text message records were admitted in their entirety into evidence for identification.

The Defendant raised this issue in his motion for new trial and, after a hearing, in a subsequent order denying relief, the trial court found that it properly limited the Defendant's questioning of the victim based upon the cumulative nature of the testimony. The trial court stated that, at the point it sustained the State's objection, the Defendant's messages being introduced were mostly repetitive.

A defendant's constitutional right to confront the witnesses against him includes the right to conduct meaningful cross-examination. *State v. Wyrick*, 62 S.W.3d 751, 770 (Tenn. Crim. App. 2001). Denial of the defendant's right to effective cross-examination is "'constitutional error of the first magnitude'" and may violate the defendant's right to a fair trial. *State v. Hill*, 598 S.W.2d 815, 819 (Tenn. Crim. App. 1980) (quoting *Davis v. Alaska,* 415 U.S. 308, 318, (1974)). "The propriety, scope, manner and control of the cross-examination of witnesses, however, rests within the sound discretion of the trial court." *State v. Dishman*, 915 S.W.2d 458, 463 (Tenn. Crim. App. 1995); *Coffee v. State*, 216 S.W.2d 702, 703 (1948). Furthermore, "a defendant's right to confrontation does not preclude a trial court from imposing limits upon cross-examination which take into account such factors as harassment, prejudice, issue confrontation, witness safety, or merely repetitive or marginally relevant interrogation." *State v. Reid*, 882 S.W.2d 423, 430 (Tenn. Crim. App. 1994).

The defendant's right to cross-examine a witness is also limited to questions that are designed to elicit relevant evidence. As we have stated, Rule 403 provides that some evidence, "although relevant, . . . may be excluded if its probative value is substantially

outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. Rule Evid. 403.

After review of the entirety of the records, we cannot conclude the trial court abused its discretion by limiting the questioning about text message exchanges between the Defendant and the victim. The jury had already heard extensive testimony about their exchanges and the remaining messages contained similar content. As the trial court stated in the order denying the Defendant's motion for new trial, at a certain point, the testimony about the messages became repetitive and were, in our view, a needless presentation of cumulative evidence. *See* Tenn. R. Evid. 403. The trial court is authorized to exercise its discretion in imposing appropriate limits upon the examination of witnesses. *See* Tenn. R. Evid. 611; *State v. Lewis*, 803 S.W.2d 260, 262 (Tenn. Crim. App. 1990). A defendant's right to confrontation does not preclude a trial court from imposing limits upon cross-examination which take into account such factors as . . . merely repetitive . . . interrogation. *State v. Reid*, 882 S.W.2d 423, 430 (Tenn. Crim. App. 1994) (citations omitted). We conclude that the trial court's limitation of the cross-examination did not go beyond reasonable limits given the repetitive nature of the subject of the messages and the considerable leeway given by the trial court in allowing the Defendant to cross-examine the victim without any limitations. As such, we conclude that the trial court did not abuse its direction when it limited testimony about additional text messages of the same content. The Defendant is not entitled to relief as to this issue.

**B. Sufficiency of Evidence**

The Defendant contends that the evidence is insufficient to sustain his convictions. He contends that there was insufficient proof of non-consensual penetration and that the victim's statements to the contrary to Dr. Piercy were hearsay statements that could not be considered as substantive evidence. The State responds that the evidence is sufficient to support the Defendant's convictions. We agree with the State.

When an accused challenges the sufficiency of the evidence, this court's standard of review is whether, after considering the evidence in the light most favorable to the State, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *see* Tenn. R. App. P. 13(e); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999) (citing *State v. Dykes*, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990)). In the

absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting *Marable v. State*, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review [for sufficiency of the evidence] 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

In determining the sufficiency of the evidence, this Court should not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999) (citing *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956)). "Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland,* 958 S.W.2d 651, 659 (Tenn. 1997). "'A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State.'" *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978) (quoting *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973)). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523, 527 (Tenn. 1963)). This court must afford the State the "'strongest legitimate view of the evidence'" contained in the record, as well as "'all reasonable and legitimate inferences'" that may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000).

Relevant to the Defendant's argument that there was insufficient proof of non-consensual penetration, as contemplated by the statutory definition of rape,[1] sexual penetration includes "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's, the defendant's, or any other person's body, but emission of semen is not required." T.C.A. § 39-13-501(7) (2016). "'Sexual contact' includes the intentional touching of the victim's[ ] [or] the defendant's . . . intimate parts, or the intentional touching of the clothing covering the immediate area of the victim's[ ] [or] the defendant's . . . intimate parts, if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification." T.C.A. § 39-13-501(6).

The evidence viewed in the light most favorable to the State was that the victim awoke in her bed, after consuming alcohol, to find the Defendant undressing her. He inserted his fingers into her vagina and then his penis. The victim testified that she felt a tearing sensation in her vagina, and Dr. Piercy's physical examination revealed the presence of signs of traumatic penetration. This is sufficient evidence from which a jury could conclude beyond a reasonable doubt that the Defendant was guilty of rape by way of sexual penetration of the victim without the victim's consent. The Defendant is not entitled to relief.

## C. Suspended Sentence

The Defendant lastly contends that the trial court erred when it denied his motion for a suspended sentence. He contends that his lack of criminal history, his steady employment, the character references submitted on his behalf, and his good behavior while released on bond weigh in favor of a sentence served outside of confinement. He requests that this court modify his sentence to probation. The State replied that the trial court properly considered the alternative sentencing factors and, in light of its consideration, did not abuse its discretion when it denied the Defendant's request.

"[S]entences imposed by the trial court within the appropriate statutory range are to be reviewed under an abuse of discretion standard with a 'presumption of reasonableness.'" *State v. Bise*, 380 S.W.3d 682 (Tenn. 2012). A finding of abuse of discretion "'reflects that the trial court's logic and reasoning was improper when viewed in

---

[1]Tennessee Code Annotated section 39-13-503 defines rape as: (a) Rape is unlawful sexual penetration of a victim by the defendant or of the defendant by a victim accompanied by any of the following circumstances:

> (2) The sexual penetration is accomplished without the consent of the victim and the defendant knows or has reason to know at the time of the penetration that the victim did not consent;

light of the factual circumstances and relevant legal principles involved in a particular case.'" *State v. Shaffer*, 45 S.W.3d 553, 555 (Tenn. 2001) (quoting *State v. Moore*, 6 S.W.3d 235, 242 (Tenn. 1999)). To find an abuse of discretion, the record must be void of any substantial evidence that would support the trial court's decision. *Id.* at 554-55; *State v. Grear*, 568 S.W.2d 285, 286 (Tenn. 1978); *State v. Delp*, 614 S.W.2d 395, 398 (Tenn. Crim. App. 1980). The reviewing court should uphold the sentence "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Bise*, 380 S.W.3d at 709-10. So long as the trial court sentences within the appropriate range and properly applies the purposes and principles of the Sentencing Act, its decision will be granted a presumption of reasonableness. *Id.* at 707. This includes the questions related to probation or any other alternative sentence." *State v. Caudle*, 388 S.W.3d 273, 278-79 (Tenn. 2012). The defendant bears "[t]he burden of demonstrating that the sentence is improper." *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991).

The trial court must consider: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the mitigating and enhancement factors set out in Tennessee Code Annotated sections 40-35-113 and -114; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and (7) any statement the defendant made on the defendant's own behalf about sentencing. *See* T.C.A. § 40-35-210 (2014); *State v. Taylor*, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001).

A trial court's decision regarding probation will only be invalidated if the court "wholly departed from the relevant statutory considerations in reaching its determination." *State v. Sihapanya*, 516 S.W.3d 473, 476 (Tenn. 2014). Under an abuse of discretion standard, an appellate court may not substitute its judgment for that of the trial court. *Id.* at 475.

With regard to alternative sentencing, Tennessee Code Annotated section 40-35-102(5) provides as follows:

> In recognition that state prison capacities and the funds to build and maintain them are limited, convicted felons committing the most severe offenses, possessing criminal histories evincing a clear disregard for the laws and morals of society, and evincing failure of past efforts at rehabilitation shall be given first priority regarding sentencing involving incarceration.

A defendant shall be eligible for probation, subject to certain exceptions, if the sentence

16

imposed on the defendant is ten years or less. T.C.A. § 40-35-303(a) (2014). A defendant is not, however, automatically entitled to probation as a matter of law. The burden is upon the defendant to show that he or she is a suitable candidate for probation. T.C.A. § 40-35-303(b) (2014); *State v. Goode*, 956 S.W.2d 521, 527 (Tenn. Crim. App. 1997); *State v. Boggs*, 932 S.W.2d 467, 477 (Tenn. Crim. App. 1996). In order to meet this burden, the defendant "must demonstrate that probation will 'subserve the ends of justice and the best interest of both the public and the defendant.'" *State v. Bingham*, 910 S.W.2d 448, 456 (Tenn. Crim. App.1995) (quoting *State v. Dykes*, 803 S.W.2d 250, 259 (Tenn. Crim. App. 1990)).

There is no bright line rule for determining when a defendant should be granted probation. *Bingham*, 910 S.W.2d at 456. Every sentencing decision necessarily requires a case-by-case analysis considering "the nature of the offense and the totality of the circumstances . . . including a defendant's background." *State v. Ashby*, 823 S.W.2d 166, 168 (Tenn. 1991) (quoting *State v. Moss*, 727 S.W.2d 229, 235 (Tenn. 1986)). In determining if incarceration is appropriate in a given case, a trial court should consider whether:

> (A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;
>
> (B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or
>
> (C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant.

T.C.A. § 40-35-103(1) (2014). "When considering probation, the trial court should consider the nature and circumstances of the offense, the defendant's criminal record, the defendant's background and social history, the defendant's present condition, including physical and mental condition, the deterrent effect on the defendant, and the best interests of the defendant and the public." *State v. Brian Allen Cathey*, No. E2015-01284-CCA-R3-CD, 2016 WL 2641766, at *3 (Tenn. Crim. App., at Knoxville, May 6, 2016) (citations omitted). The court should also consider the defendant's truthfulness. *State v. Bunch*, 646 S.W.2d 158, 160 (Tenn. 1983). The trial court must also consider the potential or lack of potential for rehabilitation or treatment of the defendant in determining the sentence alternative or length of a term to be imposed. T.C.A. § 40-35-103.

17

At sentencing, the trial court noted the Defendant's minor criminal record of traffic offenses. In consideration of the Defendant's request for probation, the trial court noted the circumstances of the offense, specifically the Defendant being the victim's father, thus placing him in a position of authority, and his behavior towards her, including his furnishing her with alcohol, and determined that an alternative sentence was not warranted. The trial court made this conclusion in light of its consideration of the deterrent effect on the Defendant and the best interests of the public and the victim. The trial court further concluded that probation would not serve the ends of justice or society as a whole.

The evidence presented at trial and at the sentencing hearing established that the victim, who was shy and reserved by her own admission, was traumatized by the Defendant's actions, as evidenced by her threatening suicide, and that the impact on her behavior was substantial. The Defendant took advantage of the victim's vulnerability and naiveté by giving her alcohol and drugs at adult parties and then raping her when she was intoxicated. Based on this evidence, we conclude that the Defendant has not established that the trial court abused its discretion by denying him an alternative sentence. The Defendant is not entitled to relief.

### III. Conclusion

In accordance with the aforementioned reasoning and authorities, we affirm the judgments of the trial court.

_____
ROBERT W. WEDEMEYER, JUDGE