IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs June 9, 2020

## STATE OF TENNESSEE v. AMANDA FAYE LAYNE

**Appeal from the Circuit Court for Grundy County**
No. 5976      Thomas W. Graham, Judge

_____

### No. M2019-01180-CCA-R3-CD
_____

Defendant, Amanda Faye Layne, was convicted by a jury of simple possession of a Schedule II controlled substance and possession of drug paraphernalia. On appeal, Defendant argues that the trial court erred in limiting cross-examination of the arresting officer regarding a pretrial statement, that the State committed improper prosecutorial argument in closing argument, and cumulative error. After a thorough review of the record and applicable case law, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which THOMAS T. WOODALL and TIMOTHY L. EASTER, JJ., joined.

Matthew S. Bailey, Spencer, Tennessee, for the appellant, Amanda Faye Layne.

Herbert H. Slatery III, Attorney General and Reporter; Sophia S. Lee, Senior Assistant Attorney General; Mike Taylor, District Attorney General; and Dave McGovern, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

### Factual and Procedural History

*Pretrial Hearing*[1]

---

[1] The pretrial hearing is repeatedly referred to as a "suppression hearing" throughout the proceedings. However, no motion to suppress is included in the record, nor is any ruling on a motion to suppress. For clarity, we will refer to this hearing as the "pretrial hearing" to differentiate it from the "preliminary hearing."

Defendant filed a pretrial Motion to Dismiss the indictment based upon *State v. Ferguson*, 2 S.W.3d 912 (Tenn. 1999), arguing that Officer Keith Cencelewski's surveillance video of Defendant's arrest, Defendant's purse, backpack, and "non-contraband contents of the backpack" were lost or destroyed. At a pretrial hearing, Officer Cencelewski with the Lincoln County Sheriff's Department testified that, in August 2017, he was a patrolman with the Tracy City Police Department. He said that, based on a call he received that "a man and a woman were walking down the middle of the road, impeding traffic[,]" he went to Oak Street in Tracy City "off of Railroad Avenue." He stated:

> [Oak Street is] approximately an eighth of a mile long, and when I turned on to it, I observed a white female, facing away from me, walking down the middle of [the] road. It's only two lanes, one lane this way, one lane that way. But she [was] right in the middle of the road swaying side to side.

Officer Cencelewski stated that he knew Defendant. He said that he pulled his patrol vehicle off the road with his blue lights on and summoned Defendant to him. Officer Cencelewski testified that Defendant appeared to be intoxicated and incoherent. He told Defendant that he was arresting her for public intoxication "for her safety and the safety of the public." He testified that no other officers came to the scene to "back [him] up."

Officer Cencelewski stated that, upon a search of Defendant's person, he found methamphetamine in her front pocket, which the Tennessee Bureau of Investigation ("TBI") crime lab determined to weigh .28 grams. Defendant told Officer Cencelewski that the methamphetamine belonged to her son and had been in his purse, which her son left with her when he "took off." Officer Cencelewski was "hesitant to comment" on whether Defendant's son typically wore female clothing but stated that Defendant's son was "different." He stated that he also found "a snorting straw, a tourniquet, a spoon[,] and syringe" in the purse. Officer Cencelewski testified that he did not request a blood sample from Defendant.

Officer Cencelewski said that he was wearing a body camera and recorded the encounter with Defendant. He stated that, when he returned to the police department, the video was downloaded but that, at the time of the hearing, he did not know the location of the recording and that he "couldn't find it." He testified that the police department "had issues with the recordings and the maintenance of that stuff in the past."

- 2 -

On cross-examination, Officer Cencelewski stated that, when he pulled onto Oak Street, it took him twenty or thirty seconds to arrive at Defendant's location, "a sixteenth of a mile" down the road. The following exchange occurred:

[DEFENSE COUNSEL]: 'Cause there was [twenty, thirty] seconds that you were slowly moving before you pulled over, did you have your blue lights on at the beginning of those [twenty, thirty] seconds --

[OFFICER CENCELEWSKI]: Beginning.

[DEFENSE COUNSEL]: Or half way through? At the beginning.

[OFFICER CENCELEWSKI]: Yes, sir.

[DEFENSE COUNSEL]: So . . . you had your blue lights on about the time that you turned on [Oak Street], off [Railroad Avenue]?

[OFFICER CENCELEWSKI]: That's correct.

[DEFENSE COUNSEL]: So how much did you observe her while you were on [Railroad Avenue]?

[OFFICER CENCELEWSKI]: Zero.

[DEFENSE COUNSEL]: So you're on the main road, you don't observe her stumbling because I mean, --

[OFFICER CENCELEWSKI]: (interposing) Correct.

[DEFENSE COUNSEL]: Taking your word on it, she is stumbling?

[OFFICER CENCELEWSKI]: Correct.

[DEFENSE COUNSEL]: But you haven't really observed her on [Railroad Avenue], you turn on to that off road and --

[OFFICER CENCELEWSKI]: (interposing) And boom there she is.

[DEFENSE COUNSEL]: You blue light her.

[OFFICER CENCELEWSKI]: Correct. Because she's in the middle of the road swaying side to side. I wanted to prevent vehicles, alerting her that she was in the middle of the road.

Officer Cencelewski testified that, after he summoned Defendant to the side of the road, Defendant "kept getting in [his] personal space right in [his] face[.]" He stated that, when he inventoried the purse and backpack found on Defendant, he did not itemize anything that was not evidence and that he did not find an identification card. Officer Cencelewski agreed that there was no evidence that made him believe that Defendant was in the business of selling or delivering drugs.

The trial court questioned Officer Cencelewski as to why the body camera recording could not be found. Officer Cencelewski responded that they had "issues with that software." Officer Cencelewski stated that he never viewed the footage of Defendant's arrest.

At the conclusion of the testimony, defense counsel argued that Officer Cencelewski did not have reasonable suspicion to "blue light" Defendant immediately upon turning onto Oak Street. The following exchange occurred:

[DEFENSE COUNSEL]: And if I just see someone in the middle of the road and click my blue lights on, I don't know if she's breaking the law or not. I mean she may ----

[OFFICER CENCELEWSKI]: (interposing) I mean I can change my testimony to two seconds --

THE COURT: (interposing) Well, he said he could see her walking apparently for a few seconds before he clicked his blue light. He could see her in the middle of the road, sorta stumbling that's the way it sounded to me. Is that what you were saying?

[OFFICER CENCELEWSKI]: That's correct, Your Honor.
After the trial court denied Defendant's motion to dismiss, defense counsel requested an instruction telling the jury that there was a video that was no longer present and that they may, if they chose to, make a positive inference for Defendant. The trial court denied the *Ferguson* motion, stating:

I don't know that there's any law like that, is there? . . . That would be highly unusual for a judge to say, hey, since this is missing you can infer that it's missing because of the negligence and/or the intentional act of the

sheriff[,] therefore you can, you know, you can interpret this as being proof that the person wasn't intoxicated. [There] would be all kinds of problems with that kind of instruction[], you'd like to have it that way. I don't believe that would be appropriate.

*Trial*

At trial, Officer Cencelewski testified that, on August 22, 2017, he was working as a patrolman for the Tracy City Police Department when he responded to a radio call to go to Oak Street and that he approached from Railroad Avenue. He stated that Oak Street had regular traffic but agreed it was a "fairly minor road." He said that the first thing he saw as he approached the area was Defendant walking in the middle of the road. Officer Cencelewski said that he already knew Defendant. He testified:

> I [came] down Railroad Avenue, and I . . . made a right[-]hand turn onto Oak Street, that street is approximately an eighth of a mile long, in between Railroad Avenue and the main highway, U.S. 41, very short road. I saw [Defendant] in the middle of that roadway, that's was what caught my first attention there. It was paved. It's got potholes in it. It's a side road, but there are four, five, six businesses down through there that's frequently, you know, that road is frequently traveled. And I observed [Defendant], by herself, with nobody around her, in the middle of the roadway, kind of like swaying back and forth, and weaving and flailing her arms about.

Officer Cencelewski stated that he was concerned for Defendant's safety and for the safety of others who might pass through Oak Street. The following exchange occurred:

> [OFFICER CENCELEWSKI]: To be clear, as I made the turn, I observed [Defendant] in the middle of the road. She was facing away from me, so she would not have seen me turn down the road. . . . I observed her for a very brief time to see based on the call that came out, if what was come out to me [sic] was actually . . . taking place.
>
> . . . .
>
> [THE STATE]: And blue lights are on?
>
> [OFFICER CENCELEWSKI]: Correct.

Officer Cencelewski asked Defendant to come to the side of the road, and Defendant complied. He agreed that Defendant "got up in [his] space" and said that she was "not making a whole lot of sense." He said:

> She was just slurring her speech, and she, like I said, I had to tell her several times or ask her several times, to please back away from me, so we could have a talk. And she was unsteady on her feet, which [led] me to believe therefore public intoxication, either drugs, alcohol, any kind of substance at that point.

Officer Cencelewski stated that he did not smell alcohol on Defendant but that he arrested her for public intoxication. He performed a search of her person and found methamphetamine in her front pocket, which the TBI crime lab later determined to weigh .28 grams. Officer Cencelewski said that he searched the purse Defendant had with her and found an eyeglass case containing "a syringe, a spoon, a tourniquet, . . . and a short cut straw, used typically for snorting drugs." Defendant told Officer Cencelewski that the purse belonged to her son and "that he took off because he saw the cops swirling around." Officer Cencelewski testified that he knew Defendant's son and that he did not see her son in the vicinity at any time.

On cross-examination, Officer Cencelewski testified that the items found in the purse on Defendant were consistent with personal use. Officer Cencelewski agreed that Defendant did not have large amounts of cash, a scale, or several baggies of drugs. He agreed that he previously testified that "there was nothing to indicate that [Defendant] was selling or delivering drugs."

Officer Cencelewski agreed that, when he exited his car, he began recording video on his body camera. He testified that the body camera video would have shown Defendant in the middle of the road and the drugs and paraphernalia obtained from Defendant's person. Officer Cencelewski stated that the video no longer existed. He stated that he did not inventory the purse or the backpack, that he did not take pictures, that he did not request a blood test of Defendant, and that he did not take fingerprints on any items found. Officer Cencelewski agreed that, when he received the call to proceed to Oak Street, he was alerted to the presence of a man and a woman walking down the street together. Officer Cencelewski testified that he "never said [that Defendant's son] dressed like a woman" at the pretrial hearing but said that Defendant's son "acts a little different." The following exchange occurred:

[DEFENSE COUNSEL]: So you could see [Defendant] from Railroad Avenue?

[OFFICER CENCELEWSKI]: As I rounded the corner, yes, on to Oak Street.

[DEFENSE COUNSEL]: So as you round the corner on to Oak Street, you see her you claim in the middle of the road, did you immediately blue light her?

[OFFICER CENCELEWSKI]: No.

[DEFENSE COUNSEL]: You did not immediately blue light her?

[OFFICER CENCELEWSKI]: No.

[DEFENSE COUNSEL]: When did you -- when did you blue light her?

[OFFICER CENCELEWSKI]: I don't know, three seconds later, a short time later.

[DEFENSE COUNSEL]: So you round the corner three, threeish [sic] seconds later.

[OFFICER CENCELEWSKI]: Sure. . . .

[DEFENSE COUNSEL]: Let me ask you though at the [pretrial] hearing, did you ever testify that you immediately turned on your blue lights?

[OFFICER CENCELEWSKI]: I immediately turned on my blue lights? Maybe after three seconds.

[DEFENSE COUNSEL]: Did you initially testify that you immediately turned on your blue lights?

[OFFICER CENCELEWSKI]: You know I don't recall. Again, it's been a year and, you know, oh, since this [pretrial] hearing.
[DEFENSE COUNSEL]: Yeah, do you -- do you remember what you said less than a month ago at the [pretrial] hearing?

[OFFICER CENCELEWSKI]: Yes.

[DEFENSE COUNSEL]: And what did you first testify? Did you first testify that you immediately turned the blue lights on when you saw her or that you --

The State objected to the relevance of the question. The jury retired to lunch, and the following jury-out hearing was held regarding the State's objection:

[THE COURT]: So why are we concerned about when blue lights were initiated?

[DEFENSE COUNSEL]: . . . At the [pretrial] hearing, Officer Cencelewski respectfully testified that he immediately turned on his blue lights. After all the testimony was done[,] I made an argument that if all he did was see her in the middle of the road and immediately turn on his blue lights that there wasn't reasonable suspicion. Now that may or may not have been the case, I'm not trying to . . . relitigate that issue, but after that comment Officer Cencelewski without being asked a question said, ["]do you want me to change my testimony to two seconds?["] At which point, Your Honor made some comments about maybe it wasn't immediately and Cencelewski agreed that it was really two seconds. So where it is relevant is the fact that less than a month ago Officer Cencelewski on the stand, after hearing that the State's case may be weak on a point, under oath, said, ["]do you want me to change my testimony["] and then changed his testimony.

. . . .

[THE COURT]: I don't see -- I don't see that -- that -- whether or not he observed [D]efendant in the road immediately or two seconds thereafter, why that's any issue. Of even his -- of even his credibility. I mean arguing over whether it could have been two or three seconds after I turned that I first saw her or not is . . . I don't see how that does anything but I don't know what it's --

[DEFENSE COUNSEL]: (interposing) It's the offer to change one's testimony after the defense has presented argument. . . . I mean just adjust the facts so that we can win the [pretrial] hearing.

[THE COURT]: . . . I don't think it's -- I don't think that statement in the context of a minute amount of time that's being discussed could conceivably argue that he's lying.

- 8 -

[DEFENSE COUNSEL]: Well, respectfully, Your Honor, I --

[THE COURT]: (interposing) I don't see how that, I mean, you know, he may have volunteered something, but he did not say anything then any significantly different than he's saying today. So the jury is judging his credibility based on what he's saying today, and the fact that, I mean, are we down to the argument, was it two seconds or three seconds? I mean what -- what---

[DEFENSE COUNSEL]: (interposing) [W]e're not relitigating the [pretrial hearing]. The reason it's relevant is because less than a month ago and -- and the State could argue context and he didn't mean it that way and, but less than a month ago after evidence was done and we were already putting on our arguments [at the pretrial hearing], Officer Cencelewski said, ["]do you want me to change my testimony to a couple of seconds or two seconds[?"]

. . . .

[THE COURT]: (interposing) I -- I don't think this passes 403, the prejudicial effect of trying to say that's a lie versus the probative value of it, which is zero. It's just not . . . an admissible issue. There was confusion involved. It's a very minor, minute thing, and I don't think he was saying, well, I'll be happy to lie. I mean that's what you're saying. But he says, well, I'll be happy to lie it wasn't really the way I thought, but I'll be happy to change it to three seconds, that's not what he was saying. . . . It's irrelevant to this proceeding in that, you know, we're past that. The woman is in the road. He observes her and he does a[n] interview with her, which results in some of this stuff. So the fact that he didn't turn his blue lights until --

[DEFENSE COUNSEL]: (interposing) It's not that, . . . It's the fact that his testimony he offered to change his testimony. That's. . .
[THE COURT]: Well, I think it's much more prejudicial on the issue of credibility than it would be probative. I don't believe what he was saying was I'll be happy to lie. I don't believe that, and I don't think the jury ought to be -- that thrown out to the jury. So it's inadmissible to continue to pursue that. . . . [I]t doesn't rise to the level of, you know, of -- it's more confusing to discuss that at length than it would be helpful to the jury to determine whether he's lying or not. I just -- I don't think what he said at the time and -- with the [c]ourt's involvement and so forth should be held

- 9 -

as a -- as a some kind of a lie or an offer to lie. That's just -- I'm not going -- I'm not going to go that far with it.

When the jury returned, Officer Cencelewski testified that, it took him approximately two or three seconds to pull up to Defendant once he turned onto Oak Street. When presented with his conflicting testimony from the pretrial hearing, he agreed that he took twenty to thirty seconds to approach Defendant and that his blue lights were flashing the entire time he approached her. He agreed that, at the preliminary hearing[2] he testified that he turned on his blue lights after he stopped as he exited the vehicle.

Tracy City Police Chief Charlie Wilder testified that, when budgeting for body cameras, his department had to buy the cheapest cameras available. He stated that the cameras "had battery issues" and "cable issues." He said that the camera Officer Cencelewski used had to be connected to a cable at the end of his shift where the data would download onto Chief Wilder's computer. Chief Wilder testified that "apparently" there was some sort of technical malfunction on the day Defendant was arrested because he did not have the video from that day.

On cross-examination, Chief Wilder stated that Officer Cencelewski told him there had been a video of the arrest, but the video was lost. Then he stated that he did not personally know if there had been a video. Chief Wilder stated that, typically, officers were supposed to inventory items taken into evidence. Chief Wilder also agreed that his wife was "half-owner" of Hair in the City on Oak Street, which was located where Defendant was arrested. Chief Wilder stated that Defendant had several family members with criminal histories. Chief Wilder did not recall ever telling Defendant that she "need[ed] to get off the mountain" but stated that he had said similar things to people in the past. On redirect examination, he testified that, had he told Defendant to leave Tracy City, he would only have said that for "her betterment."

At the close of proof, defense counsel made a motion for acquittal for "the top felony count" of possession with intent to sell or deliver a Schedule II controlled substance. The trial court granted the motion and reduced count one to simple possession and granted the motion for judgment of acquittal on count three.

During closing remarks, the prosecutor argued:

Folks, you know, the generation just before me, just a few years younger than me, got into this MTV, Wayne's World, all this stuff, and they're

_____

[2] No transcript of the preliminary hearing appears in the record.

- 10 -

always joking about marijuana. You know a few years before that, maybe about the same time, Robin Williams would do these stand[-]up routines and he'd joke about cocaine, and people messing with drugs, it'd be just kind of a joke. Let me tell you one thing we don't hear comedians joking about, methamphetamine. Folks, there ain't nothing funny about it. It's some bad, bad stuff.

Defense counsel objected to this comment, and the trial court stated, "I think [the prosecutor's] argument's about, you know, it's a plague on the country and all that sort of thing are probably over the top a bit. We're really interested here in whether or not this person did . . . what."

The prosecutor then noted some inconsistencies in Officer Cencelewski's testimony and stated, "So I submit to you that, yeah, we can talk about what color socks was he wearing. Whether [the blue lights] started three seconds or two seconds after the turn. Those are what we call red herring arguments, they really don't matter. They're not significant. Nobody remembers everything[.]"

The jury convicted Defendant of simple possession of a Schedule II controlled substance and possession of drug paraphernalia.

*Sentencing and Motion for New Trial*

Following a sentencing hearing, the trial court sentenced Defendant to concurrent sentences of eleven months and twenty-nine days in the county jail. Defendant filed a motion for new trial and an amended motion for new trial, arguing that the trial court erred by failing to suppress the fruit of Officer Cencelewski's "illegal search and seizure," by preventing defense counsel from questioning the jury pool regarding "basic legal concepts" during voir dire, and by ruling that cross-examining Officer Cencelewski would violate Tennessee Rule of Evidence 403. Defendant further argued that the prosecutor committed improper prosecutorial argument during closing arguments, that the evidence was insufficient to support the verdicts, and that cumulative error required reversal. Following a hearing, the trial court denied Defendant's motion for new trial.

## Analysis

*I. Cross-Examination*

Defendant argues that the trial court denied her the right to meaningfully cross-examine Officer Cencelewski regarding his statement at the pretrial hearing, "I mean I can change my testimony to two seconds[,]" after hearing defense counsel's argument

that Officer Cencelewski had no reasonable suspicion to immediately "blue light" Defendant when Officer Cencelewski turned onto Oak Street. Defendant contends that because the State's case turned on Officer Cencelewski's credibility, she should have been permitted to cross-examine him to impeach him regarding this statement. Moreover, she asserts that the trial court improperly weighed Officer Cencelewski's credibility, arguing that, "[i]n concluding that 'I can change my testimony' did not really mean the officer was offering to change his testimony, the trial court improperly usurped the jury's role as the trier of fact."

The State responds that Defendant has not provided an offer of proof. It argues that because Officer Cencelewski's statement occurred when "the defense was making its argument" at the pretrial hearing, it "strongly suggests that the proof was closed and that Officer Cencelewski was no longer under oath." The State asserts that, during the jury-out hearing at trial, "Officer Cencelewski was not questioned about his comment" at the pretrial hearing or about "whether it was made under oath." Alternatively, the State argues that any error was harmless.

A defendant's constitutional right to confront witnesses includes the right to conduct meaningful cross-examination. *Pennsylvania v. Ritchie*, 480 U.S. 39, 51 (1987); *State v. Brown*, 29 S.W.3d 427, 430-31 (Tenn. 2000). "Cross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested." *Davis v. Alaska*, 415 U.S. 308, 316 (1974). The denial of a defendant's right to effective cross-examination is "'constitutional error of the first magnitude'" and may violate the defendant's right to a fair trial. *State v. Hill*, 598 S.W.2d 815, 819 (Tenn. Crim. App. 1980) (quoting *Davis*, 415 U.S. at 318).

Here, the trial court provided Defendant ample leeway in her cross-examination of Officer Cencelewski. After several questions about Officer Cencelewski's use of "immediately" concerning the activation of his blue lights, the State objected to that line of questioning. Concerning Officer Cencelewski's estimation of the time it took him to activate his blue lights after observing Defendant walking down the middle of the roadway, the trial court reasoned "whether or not [Officer Cencelewski] observed [D]efendant in the road immediately or two seconds thereafter" does not affect his credibility and limited further questioning.

A trial "court shall exercise appropriate control over the presentation of evidence and conduct of the trial when necessary to avoid abuse by counsel." Tenn. R. Evid. 611(a). "The scope of cross-examination is largely within the discretion of the trial court; that discretion will not be disturbed absent abuse." *State v. Lewis*, 803 S.W.2d 260, 262 (Tenn. Crim. App. 1990). "[A] defendant's right to confrontation does not preclude a trial court from imposing limits upon cross-examination which take into account such

factors as harassment, prejudice, issue confusion, witness safety, or merely repetitive or marginally relevant interrogation." *State v. Reid*, 882 S.W.2d 423, 430 (Tenn. Crim. App. 1994). Here, Defendant was trying to characterize Officer Cencelewski's explanation to the court that he could say "two seconds" rather than "immediately" as an offer to change his testimony. The trial court rejected that characterization and treated the officer's statement, made after his testimony had concluded, as an explanation of what the term "immediately" meant to Officer Cencelewski. The trial court did not abuse its discretion in limiting the cross-examination of Officer Cencelewski on this issue.

## II. Improper Prosecutorial Argument

The trial court has wide discretion in controlling the course of arguments and will not be reversed absent an abuse of discretion. *Terry v. State*, 46 S.W.3d 147, 156 (Tenn. 2001). Closing argument by a prosecutor "is a valuable privilege that should not be unduly restricted." *State v. Bane*, 57 S.W.3d 411, 425 (Tenn. 2001). That said, Tennessee courts have recognized numerous prosecutorial arguments as improper. It is improper for a prosecutor to engage in derogatory remarks, appeal to the prejudice of the jury, misstate the evidence, or make arguments not reasonably based on the evidence. *State v. Banks*, 271 S.W.3d 90, 131 (Tenn. 2008).

In *State v. Goltz*, 111 S.W.3d 1 (Tenn. Crim. App. 2003), this court listed "five general areas of prosecutorial misconduct" that can arise during closing argument:

(1) intentionally misleading or misstating the evidence;

(2) expressing a personal belief or opinion as to the truth or falsity of the evidence or defendant's guilt;

(3) making statements calculated to inflame the passions or prejudices of the jury;

(4) injecting broader issues than the guilt or innocence of the accused; and

(5) intentionally referring to or arguing facts outside the record that are not matters of common public knowledge.

*Goltz*, 111 S.W.3d at 6.

"In determining whether statements made in closing argument constitute reversible error, it is necessary to determine whether the statements were improper and, if so, whether the impropriety affected the verdict." *State v. Pulliam*, 950 S.W.2d 360, 367

(Tenn. Crim. App. 1996). In *Judge v. State*, 539 S.W.2d 340 (Tenn. Crim. App. 1976), this court listed the following factors to be considered when determining whether the improper conduct of a prosecutor affected the verdict to the prejudice of the defendant: (1) the conduct complained of viewed in context and in light of the facts and circumstances of the case; (2) the curative measures undertaken by the court and the prosecution; (3) the intent of the prosecutor in making the improper statement; (4) the cumulative effect of the improper conduct and any other errors in the record; and (5) the relative strength or weakness of the case. *Id.* at 344.

Here, the State contends that, "[a]ssuming arguendo [the remarks were] improper," the record does not establish that the State's closing remarks "had an effect on the verdict." Therefore, the State argues, the remarks were harmless.

In reviewing the harmless error factors, we conclude that the prosecutor's argument regarding comedians refusing to joke about methamphetamine was an isolated utterance and not a "recurring theme" throughout the argument. *See State v. Adam Wayne Robinson*, No. M2013-02703-CCA-R3-CD, 2015 WL 3877705, at *16 (Tenn. Crim. App. June 23, 2015). However, the trial court provided no curative instruction regarding the State's remarks and only commented that it was "probably over the top a bit." While "[d]etermining someone's intent is difficult[,]" *id.*, there is nothing in the record to indicate that the prosecutor's intent was to improperly influence the jury's decision with his comment, and Defendant proffers no possible nefarious intent. There was no "persistent pattern of misconduct during closing argument" that would give rise to cumulative error. *Id*.

Finally, if the evidence were believed by the jury, the prosecution's case was strong. *See id*. (stating that "strong circumstantial evidence if believed by the jury" showed the relative strength of the prosecutor's case). Officer Cencelewski testified that Defendant was stumbling and incoherent leading him to believe that she was under the influence. Officer Cencelewski testified that he found 0.28 grams of methamphetamine in Defendant's front pocket and drug paraphernalia commonly used to ingest or smoke methamphetamine in the purse she was carrying. These facts, if believed by the jury, show a strong prosecution case. Thus, only one factor weighs in favor of reversible error due to improper prosecutorial argument. We conclude that the error was harmless.

### III. Cumulative Error

The cumulative error doctrine recognizes that there may be many errors committed in trial proceedings, each of which constitutes mere harmless error in isolation, but "have a cumulative effect on the proceedings so great as to require reversal in order to preserve a defendant's right to a fair trial." *State v. Hester*, 324 S.W.3d 1, 76

(Tenn. 2010). To warrant review under the cumulative error doctrine, there must have been more than one actual error during the trial proceedings. *Id.* at 77. There is one harmless error, so there are insufficient errors to warrant cumulative error relief.

## Conclusion

For the foregoing reasons, the judgments of the trial court are affirmed.


_____
ROBERT L. HOLLOWAY, JR., JUDGE