# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE AT NASHVILLE

Assigned on Briefs February 10, 2021

## STATE OF TENNESSEE v. TERRANCE LAWRENCE, a.k.a. TERENCE LAWRENCE

**Appeal from the Criminal Court for Davidson County**
**No. 2017-B-1168     Jennifer Smith, Judge**

_____

### No. M2020-00630-CCA-R3-CD

_____

Following a jury trial, the Defendant, Terrance Lawrence, a.k.a. Terence Lawrence, was convicted of especially aggravated kidnapping, aggravated assault, domestic assault, driving on a suspended driver's license, and possession of a firearm after having been convicted of a felony involving the use or attempted use of force, violence, or a deadly weapon. The trial court imposed an effective sixty-year sentence. On appeal, the Defendant contends that (1) the trial court erred in limiting his cross-examination of the victim and the investigating officer; (2) the trial court erred in refusing to allow him to testify regarding his mental health issues; (3) the trial court erred in denying his request for a mistrial; and (4) he is entitled to a new trial due to cumulative error. We affirm the judgments of the trial court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed

JOHN EVERETT WILLIAMS, P.J., delivered the opinion of the court, in which ALAN E. GLENN and ROBERT W. WEDEMEYER, JJ., joined.

Timothy Carter, Nashville, Tennessee, for the appellant, Terrance Lawrence, a.k.a. Terence Lawrence.

Herbert H. Slatery III, Attorney General and Reporter; Sophia S. Lee, Senior Assistant Attorney General; Glenn R. Funk, District Attorney General; and Doug Thurman and Kristen Taylor, Assistant District Attorneys General, for the appellee, State of Tennessee.

# OPINION

## FACTUAL AND PROCEDURAL HISTORY

The evidence presented at trial established that on the morning of January 18, 2017, the Defendant approached his former girlfriend, Ms. Danielle Stewart, in the parking lot of a convenience store, grabbed her, pointed a gun at her, forced her into his car, drove around while pointing the gun to her head and threatening to kill her, and then dropped her off at another nearby convenience store after the victim convinced him that they would rekindle their relationship. The parties stipulated at trial that prior to the date of the incident, the Defendant had been convicted of a felony involving the use or attempted use of force, violence, or a deadly weapon.

At trial, the victim testified that she and the Defendant were in a relationship for a little more than one year and that she ended the relationship in May of 2016. The Defendant continued to pursue the victim, call her, and send her text messages. He showed up to the Mapco convenience store where the victim purchased her morning coffee, her church, and the rink where she roller skated. On the weekend of January 14, 2017, the victim attended a skating party in Huntsville, Alabama, and the Defendant showed up even though she did not invite him. The Defendant gave her a Valentine card and a key chain with her name on it. The victim stated that the Defendant saw her skating with another man at the party, but he "kind of acted like it was okay."

The victim testified that on the morning of Wednesday, January 18, 2017, she did not go to Mapco because traffic was backed up but went to a nearby Shell convenience store instead. The victim exited her car at the gasoline pump while her co-worker, Ms. Lacretia Hodges, remained in the front passenger seat. While the victim was pumping gasoline into her car, she saw the Defendant drive up from the opposite side of the convenience store in a black Nissan Maxima. The Defendant had called the victim two or three days prior to the kidnapping, but the victim had neither answered his call nor listened to his voice message. The Defendant exited his car, approached the victim, and commented about her failure to answer his calls. Before the victim could reply, the Defendant grabbed her by her coat and held a black gun to her head. The Defendant held the gun with his right hand while wearing a glove. The victim, who was four feet, seven inches tall and weighed 120 pounds, was unable to get away from the Defendant.

The Defendant took the victim to his car and shoved her into the front passenger side. The victim's hand struck the console, and a ring that she was wearing cut into her finger and chipped a bone. The Defendant waved his gun at the victim and ordered her to move into the driver's seat so that she could drive. When the victim was unable to move over, the Defendant crawled over her and got into the driver's seat. The victim testified

that when she was about to get out of the car, the Defendant put the gun to the side of her head and threatened to kill her. The Defendant drove away from Shell while holding the gun to the victim's head. The victim testified that the Defendant said he was going to kill her because she had skated with another man. He called the victim names and stated that she did not know how he felt.

The victim stated that she remained in the car with the Defendant for approximately five minutes before he allowed her to leave. She said she pleaded with him, promised that they would reconcile, told him that she forgave him and loved him, and kissed him. She told him that she would go to work and act as if the incident had not occurred. She testified that she did not mean any of the things that she told the Defendant but only made the statements in an effort to persuade him to free her. The Defendant removed the gun from the victim's head and tinkered with the gun, and the victim "assumed" that he deactivated the safety. The Defendant apologized to the victim and stated, "I'm going to get in trouble now."

When the Defendant began to return to Shell, he recalled that Ms. Hodges was in the victim's car and feared that she might have called the police. The victim instructed him to release her at Mapco, which was located about 1,000 feet from Shell. The victim walked back to Shell and removed the gas pump from her car. She explained that she was so shaken that she decided to try to calm herself by going to work and continuing with her day. Ms. Hodges was still sitting in the passenger side of the victim's car, had been looking down at her cell phone during the five or six minutes that the victim had been gone, and believed the victim had gone into the store. The victim explained that she did not tell Ms. Hodges about the incident because the victim was embarrassed and did not want Ms. Hodges to know that the victim "was in a relationship like that." The victim drove to her place of employment and worked for the remainder of the day.

After leaving work, the victim drove to a police station and reported the incident. An officer visited the victim at her home and offered to take her to sign the papers necessary to obtain a warrant and an order of protection against the Defendant. While en route, the victim became afraid and told the officer that her sister would accompany her to complete the paperwork the following day. On the next day, the victim obtained an order of protection against the Defendant.

The victim identified herself and the Defendant in a surveillance video recording from Shell. The video showed the victim filling her car with gasoline while the Defendant pulled up to another gasoline pump. The Defendant exited his car, approached the victim, grabbed her by her collar, and pulled a gun out of the pocket of his hoodie. The Defendant shoved the victim inside his car on the passenger side, climbed over the victim to the driver's side, and drove away. Approximately five minutes later, the victim

ran back to her car, removed the gasoline pump, entered her car, and drove away. Still shots from the video also were entered into evidence and showed the Defendant pulling a gun from his pocket while holding his other hand on the victim's collar and forcing the victim into his car at gunpoint while holding the gun in his right hand.

On cross-examination, the victim testified that approximately thirty minutes after the incident, while she was driving to work, the Defendant called her and apologized. She wore an ear piece, so Ms. Hodges was unable to hear the conversation. The victim stated that while she and the Defendant were in his car, he never declared any intention of harming himself, did not point the gun at his chest, and did not give her a note that he had written to his son. Either the night after the incident or the following day, the Defendant called the victim and told her for the first time that his intention in forcing her into the car was to commit suicide. He later came to her home and sent her a letter. The victim acknowledged that the Defendant was missing half of his index finger on his right hand.

Metropolitan Nashville Police Officer Michael Apsey testified that on January 19, 2017, he was dispatched to the victim's home in response to an incident of domestic violence. The dispatcher reported that the victim wished to speak to an officer about the Defendant's kidnapping her at gunpoint on the prior day. Officer Apsey asked the victim whether she had any injuries, and she identified an injury to her left hand. Officer Apsey examined the victim's left hand and observed swelling and redness. The victim declined medical treatment.

Metropolitan Nashville Police Detective Arthur Hummell with the domestic violence division was assigned the case on January 24th and interviewed the victim on the following day. He testified that the victim identified the Defendant as the person who took her from the convenience store. Detective Hummell reviewed the surveillance video recording and stated that it was consistent with the events described by the victim. An arrest warrant was issued for the Defendant, and he was arrested on January 27th wearing clothing consistent with the clothing that he was wearing in the video. Officers executed a search warrant of the black Nissan Maxima parked at the Defendant's residence but were unable to locate the firearm. Detective Hummell identified a certified copy of the Defendant's driving history showing that his driver's license was suspended at the time of the incident.

On cross-examination, Detective Hummell testified that he believed he explained the procedures for prosecution to the victim. He stated that he, generally, ensured that a victim understood the need to participate in the prosecution. He also stated that he always recommended counseling, an order of protection, prosecution of the defendant, and a safe haven for the victim and any children. He believed he made these recommendations to the victim.

The Defendant testified that he and the victim dated for twenty-two months, that their relationship ended in May of 2016, and that they remained cordial and continued to spend time together. At the end of 2016 and the beginning of 2017, the Defendant was attempting to rekindle the relationship. He stated that during some mornings, he went to Mapco where the victim purchased coffee on a daily basis and surprised her with roses. He maintained that the victim seemed to appreciate the gifts and never told him to leave her alone.

The Defendant testified that during the weekend prior to the incident, he went to a skating party in Huntsville, Alabama, with a friend and saw the victim. He stated that the victim was friendly with him and sat in his lap at one point. He gave her a key ring, which she accepted. He stated that he later saw the victim skating with another man, was hurt, and started to leave, but the victim stopped him. He also stated that they made plans to have dinner together but that the victim canceled the plans when she saw him around other women, who he maintained were merely friends. After returning home, the victim and the Defendant exchanged text messages in which the victim stated that she "hated" him.

The Defendant testified that "everything just piled up," that his ex-wife was keeping him from seeing his son, that he was unable to sleep or eat, and that he was "tired of hurting all the time." He maintained that the victim was "the last thing in [his] life that brought [him] joy" and believed that since she hated him, he should commit suicide. He stated that he wrote a letter to his three-year-old son, apologizing that he would not be around to see his son grow up, and placed the letter in his Bible, which he placed on the console of his car.

The Defendant testified that on the morning of the incident, he went to Mapco looking for the victim, but she was not there. He then went to Shell, where he stated that he purchased breakfast on a daily basis. He stated that he believed his seeing the victim there was "a sign" that he should commit suicide. He said he "frightened her into" getting into his car and later clarified that he pointed a gun at her head, called her a "b***h," and threatened to harm her if she did not get into his car. He maintained that he asked her to drive because he wanted to shoot himself. When she refused, he climbed over her and into the driver's side. The Defendant agreed that the video recording accurately depicted the events.

The Defendant testified that when he realized that the victim believed he was going to harm her, he apologized and told her that he only planned to kill himself. He explained that he turned around to return to the convenience store because the victim was still scared. The victim told the Defendant that he needed help and that they should go to

her home to talk it through. When they returned to Shell, the Defendant did not see the victim's car and believed that her friend had called the police. He stated that the victim tried to take his gun away from him, but that he refused, pointed the gun at his chest, and removed the safety. The victim snatched the gun away from him and told him not to commit suicide. The Defendant told her of the reasons that he was upset and promised to come to her home after work so that they could discuss his seeking treatment at Vanderbilt Medical Center.

The Defendant testified that while the victim was exiting his car, she grabbed the note that was sticking out of his Bible but returned it when he told her that the note was for his son. He stated that the victim kissed him and left. He maintained that he never intended to harm the victim, that he did not see her hand injured, and that while he threatened her with a gun to make her get into his car, he never specifically threatened to "kill" her. He also maintained that his only goal "was to stop hurting" and that the only way he believed he could do so was to commit suicide.

The Defendant testified that because he was missing a portion of his index finger on his right hand, he was unable to squeeze the trigger on his gun. He stated that he would have had difficulty driving with his right hand while holding the gun as described by the victim. On cross-examination, the Defendant described the gun as a .45 caliber semi-automatic handgun that he obtained from a former co-worker "off the streets." While he was speaking to the victim on his cell phone following the incident, he threw the gun into the water. He admitted to forcing the victim into his car while holding the gun but denied holding the gun to the victim's head while inside his car.

The jury convicted the Defendant of especially aggravated kidnapping, aggravated assault, domestic assault, driving on a suspended driver's license, and possession of a firearm after having been convicted of a felony involving the use or attempted use of force, violence, or a deadly weapon. Following a sentencing hearing, the trial court imposed an effective sixty-year sentence. The Defendant filed a motion for new trial, which the trial court denied. He then filed a notice of appeal in this court.

## ANALYSIS

On appeal, the Defendant contends that (1) the trial court erred in limiting his cross-examination of the victim and Detective Hummell; (2) the trial court erred in refusing to allow him to testify regarding his mental health issues; (3) the trial court erred in denying his request for a mistrial; and (4) he is entitled to a new trial due to cumulative error.

## A.  Limitation of Cross-Examination of Witnesses

The Defendant contends that the trial court erred in limiting his cross-examination of the victim and Detective Hummell.  The Defendant maintains that the trial court prevented him from questioning the victim "regarding her motivation to fabricate aspects of the events from the trip taken prior to this incident and what was truly discussed between the [v]ictim and Defendant in his car during the incident that would have come to light."  The Defendant also maintains that the trial court prevented him from questioning Detective Hummell regarding the timing of the victim's contacting the police and her decision to proceed with the prosecution.

A defendant's constitutional right to confront the witnesses against him includes the right to conduct meaningful cross-examination.  *Pennsylvania v. Ritchie*, 480 U.S. 39, 51 (1987); *State v. Brown*, 29 S.W.3d 427, 430-31 (Tenn. 2000); *State v. Middlebrooks*, 840 S.W.2d 317, 332 (Tenn. 1992), *superseded by statute as stated in State v. Reid*, 91 S.W.3d 247, 306 n.13 (Tenn. 2002) (Birch, J., concurring in part).  "'[T]he Confrontation Clause guarantees only an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.'"  *State v. Davis*, 466 S.W.3d 49, 68 (Tenn. 2015) (quoting *United States v. Owens*, 484 U.S. 554, 559 (1988)).  Furthermore, "a defendant's right to confrontation does not preclude a trial court from imposing limits upon cross-examination which take into account such factors as harassment, prejudice, issue confusion, witness safety, or merely repetitive or marginally relevant interrogation."  *State v. Reid*, 882 S.W.2d 423, 430 (Tenn. Crim. App. 1994); *see State v. Sheline*, 955 S.W.2d 42, 47 (Tenn. 1997) (stating that a defendant's right to confront and cross-examine witnesses "does not mean that a defendant has a right to present irrelevant evidence").  "The propriety, scope, manner and control of the cross-examination of witnesses … rests within the sound discretion of the trial court."  *State v. Dishman*, 915 S.W.2d 458, 463 (Tenn. Crim. App. 1995).  This court will not disturb the limits that a trial court has placed upon cross-examination unless the trial court has unreasonably restricted the right.  *Id.*

Interwoven into the Defendant's argument in his brief regarding his cross-examination of the witnesses are his claims that the evidence regarding the trip to Alabama was irrelevant and that Detective Hummell's testimony regarding his interview of the victim was inadmissible hearsay.  However, the Defendant failed to object to the admission of this evidence at trial and, therefore, these issues are waived.  *See* Tenn. R. App. P. 36(a).

The record reflects that defense counsel sought to question the victim on cross-examination about whether she asked the Defendant to seek mental health treatment and about her response when he failed to do so.  During a bench conference, defense counsel

maintained that the victim testified during the preliminary hearing that she promised the Defendant that she would not seek prosecution if he obtained mental health treatment. Defense counsel argued that he was not seeking to introduce proof of a mental illness but that, instead, the testimony was relevant to the victim's motivation for cooperating with the prosecution. The prosecutor disagreed that the victim offered such testimony at the preliminary hearing and argued that, regardless, the evidence was irrelevant. The trial court found that the evidence was irrelevant and disallowed the line of cross-examination.

The Defendant failed to make an offer of proof in the trial court regarding what any additional cross-examination would have revealed. The prosecutor challenged the accuracy of defense counsel's summary of the victim's testimony at the preliminary hearing. Defense counsel did not question the victim outside the jury's presence regarding any conversation that she may have had with the Defendant regarding his mental health, and defense counsel did not enter a transcript of the preliminary hearing into the record as part of an offer of proof. The failure to make an offer of proof precludes this court from reviewing the issue. *See State v. McCaleb*, 582 S.W.3d 179, 199 (Tenn. 2019) (holding that the State's failure to make an offer of proof regarding the excluded evidence precluded the trial court from making specific findings regarding the proposed testimony and precluded the appellate court from considering the issue); *State v. Hall*, 958 S.W.2d 679, 691 n. 10 (Tenn. 1997) ("[G]enerally, if an offer of proof is not made, the issue is deemed waived and appellate review is precluded."). Thus, the Defendant is not entitled to relief regarding this issue.

Defense counsel also sought to question Detective Hummell regarding the victim's response "as to not wanting to prosecute this crime." The prosecutor objected based on relevance, and the trial court sustained the objection. Although the Defendant asserts that the trial court erred, defense counsel failed to make an offer of proof by questioning Detective Hummell outside the presence of the jury. Because the record does not reflect what Detective Hummell's response would have been to defense counsel's questioning, the Defendant is not entitled to relief regarding this issue. *See McCaleb*, 582 S.W.3d at 199; *Hall*, 958 S.W.2d at 691 n.10.

## B. Exclusion of Evidence of the Defendant's Mental Health Issues

The Defendant asserts that the trial court erred in excluding evidence that he had been diagnosed with depression and post-traumatic stress disorder and was seeing a therapist in the time leading up to the offenses. He maintains that the evidence established that he was incapable of forming the intent to commit the offenses due to diminished capacity.

Prior to trial, the State filed a motion in limine, seeking to exclude testimony regarding the Defendant's mental health. The State maintained that the evidence was irrelevant and failed to satisfy the requirements established in *State v. Hall*, 958 S.W.2d 679 (Tenn. 1997), and that lay testimony regarding a mental health diagnosis was based on hearsay and fell outside the scope of proper lay testimony set forth in Tennessee Rule of Evidence 701. During a pretrial hearing on the motion, defense counsel announced that a mental health defense would not be presented at trial. After the Defendant testified at trial, defense counsel requested that the trial court permit the Defendant to testify regarding medications that he was taking after the incident and his discussions with a psychiatrist prior to the incident. The trial court denied the request, finding that the evidence was inadmissible.

During the sentencing hearing, the Defendant presented the report from his competency evaluation conducted after the incident and prior to trial, which reflected a diagnosis of depression and post-traumatic stress disorder. The Defendant testified during the sentencing hearing that at the time of the offenses, he was not "functioning right mentally," that he had begun seeing a therapist in November of 2016, that he had promised the victim that he would seek treatment at Vanderbilt Medical Center but failed to do so, and that he only intended to commit suicide on the day of the offenses and did not intend to harm the victim. In denying the Defendant's motion for new trial, the trial court found that the Defendant failed to meet the requirements for diminished capacity set forth in *Hall* and that he failed to provide a legitimate basis for permitting him to introduce lay testimony regarding any mental health diagnosis outside the confines of *Hall*. The trial court noted that the Defendant was not precluded from examining the victim about his demeanor and behavior at the time of the offenses and that the Defendant testified at trial about his depression and his desire and intent to commit suicide during the incident.

Under Tennessee law, evidence of a mental disease or defect that does not rise to the level of an insanity defense, nevertheless, is admissible to negate the requisite culpable mental state for the charged offense. *See State v. Phipps*, 883 S.W.2d 138, 149 (Tenn. Crim. App. 1994). In *Hall*, our supreme court explained "diminished capacity" as follows:

> [D]iminished capacity is not considered a justification or excuse for a crime, but rather an attempt to prove that the defendant, incapable of the requisite intent of the crime charged, is innocent of that crime but most likely guilty of a lesser included offense. Thus, a defendant claiming diminished capacity contemplates full responsibility, but only for the crime actually committed.

- 9 -

958 S.W.2d at 688 (citations omitted).  Psychiatric evidence that a defendant lacks the capacity to form the requisite mental state "should not be proffered as proof of 'diminished capacity.'"  *Id*. at 690.  Rather, this evidence "should be presented to the trial court as relevant to negate the existence of the culpable mental state required to establish the criminal offense for which the defendant is being tried."  *Id*. (footnote omitted).

Generally, this evidence is introduced through expert testimony showing that a defendant was "incapable of forming a criminal intent by virtue of an impaired mental condition."  *State v. Adams*, 405 S.W.3d 641, 660-61 (Tenn. 2013) (citations omitted).  To justify an instruction on diminished capacity the proof must establish that any "inability to form the requisite culpable mental state *was the product of a mental disease or defect, not just a particular emotional state or mental condition*."  *Id*. at 661 (citing *Hall*, 958 S.W.2d at 690).  Furthermore, mental health "testimony is properly admissible if it satisfies the relevancy and expert testimony provisions in the Tennessee Rules of Evidence."  *State v. Ferrell*, 277 S.W.3d 372, 379 (Tenn. 2009).  "Assuming that those standards are satisfied, psychiatric evidence that the defendant lacks the capacity, because of mental disease or defect, to form the requisite culpable mental state to commit the offense charged is admissible under Tennessee law."  *Hall*, 958 S.W.2d at 689.

The Defendant did not seek to admit any expert testimony as evidence of diminished capacity but only relied upon his own testimony regarding his diagnosis.  He fails to cite to any authority suggesting that proof of diminished capacity may be established through lay testimony alone.  Furthermore, his testimony fails to support his claim that he lacked the capacity to form the requisite culpable mental state as a result of a mental disease or defect.  Rather, he, at most, established his capacity to form the necessary mental state was impacted by a particular emotional state or mental condition.  *See State v. Faulkner*, 154 S.W.3d 48, 56-57 (Tenn. 2005) (holding that testimony that defendant "was capable of forming intent but that his ability to suppress his emotions was impaired" was properly excluded).  Although the Defendant did not mention his specific diagnosis, he was allowed to testify at trial regarding his depression, which he maintained led him to seek to commit suicide.  Accordingly, we cannot conclude that the trial court erred in excluding the evidence.

### C.  Denial of Mistrial

The Defendant argues that the trial court erred in denying his motion for a mistrial made after the State rested its case.  The record reflects that at trial, defense counsel announced that the Defendant requested that the trial court declare a mistrial and allow defense counsel to withdraw.  Defense counsel explained that the defense centered on the lack of intent, that the Defendant believed defense counsel failed to properly cross-examine the victim and impeach her with her prior testimony during the preliminary

hearing and with her prior statements to the defense investigator, and that the trial court's rulings have limited the defense of lack of intent. Defense counsel also explained that after multiple discussions with the Defendant regarding his mental health issues, defense counsel "did not see a purpose" in filing a notice of a mental health defense and, thus, failed to provide for an alternative defense.

The trial court denied the motion for mistrial and the motion to withdraw as counsel. The trial court noted that defense counsel had zealously advocated for the Defendant throughout the trial and that the trial court's rulings limiting the defense's cross-examination of witness were based upon applicable law. The trial court found no basis to suggest that a mental health defense could be supported.

"The purpose of declaring a mistrial is to correct damage done to the judicial process when some event has occurred which precludes an impartial verdict." *State v. Welcome*, 280 S.W.3d 215, 222 (Tenn. Crim. App. 2007). A mistrial should be declared only upon a showing of manifest necessity, that is, when a miscarriage of justice would result if the trial were to continue. *State v. Banks*, 271 S.W.3d 90, 137 (Tenn. 2008). The appellant bears the burden of establishing manifest necessity. *State v. Williams*, 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996). The decision to grant a mistrial lies within the sound discretion of the trial court. *State v. Saylor*, 117 S.W.3d 239, 250 (Tenn. 2003).

On appeal, the Defendant asserts that the trial court should have granted a mistrial based upon its evidentiary rulings at trial and in order to provide him the opportunity to develop and present a mental health defense. However, as we have concluded, the Defendant failed to establish that the trial court's evidentiary rulings were erroneous. The Defendant also failed to establish proof of diminished capacity or that a mental health defense could be supported. While the Defendant argues in his brief that a recording of his telephone call to the victim while he was in jail established the need for further investigation into his mental health issues, the Defendant did not enter the recording as an exhibit during the hearing and did not include it in the appellate record. *See* Tenn. R. App. P. 24(b) (providing that it is the appellant's duty to prepare a fair, accurate, and complete record on appeal to enable this court to conduct a meaningful review). Therefore, the Defendant has failed to establish that the trial court abused its discretion in declining to grant a mistrial.

### D. Cumulative Error

Finally, the Defendant asserts that he is entitled to a new trial due to cumulative error. However, he has failed to establish any error in the trial court's rulings and is, therefore, not entitled to relief. *See State v. Hester*, 324 S.W.3d 1, 77 (Tenn. 2010).

## CONCLUSION

Upon reviewing the record, the parties' briefs, and the applicable law, we affirm the judgments of the trial court.

_____
JOHN EVERETT WILLIAMS, PRESIDING JUDGE